[Crim. No. 365. Third Appellate District.—February 5, 1917.]

# THE PEOPLE, Respondent, v. DANIEL JOSEPH McDONNELL, Appellant.

CRIMINAL LAW—MURDER—SELF-DEFENSE—EVIDENCE—VERDICT CONCLUSIVE ON APPEAL.—In a prosecution for the crime of murder, where the only testimony as to the circumstances immediately preceding and attending the killing was furnished by the defendant himself, and was to the effect that the killing was in self-defense, and there was evidence which tended to discredit such testimony, the question of the determination of the guilt or innocence of the accused was one for the jury, and the appellate court cannot interfere with such determination.

ID.—FEAR OF GREAT BODILY INJURY OR DEATH—INSTRUCTION.—An instruction that if the circumstances surrounding defendant at the time of and immediately preceding the killing were sufficient to arouse the fears of a reasonable man that deceased was about to inflict upon defendant great bodily injury or death, it is not essential that deceased should have had or attempted to use a weapon in order to entitle the defendant to defend himself, is properly refused, where the court gave several instructions of similar import, as, for example, where one without fault is placed under circumstances sufficient to excite the fears of a reasonable man that another designs to commit a felony, or some great bodily injury upon him, and to afford grounds for reasonable belief that there is imminent danger, he may, acting under such fears alone, slay his assailant, and be justified by the appearances.

ID.—"MORAL CERTAINTY"—INSTRUCTION.—An instruction that the words "moral certainty" is a state of impression produced by facts in which a reasonable mind feels a sort of coercion or necessity to act in accordance with it, and is that degree of certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it, is properly refused, as being of no benefit to the average juror in relation to the conviction of the defendant.

ID.—ASSAULT WITHOUT INTENT TO KILL—INSTRUCTION.—An instruction that although the right to take life or use a deadly weapon in self-defense is unquestionable, one on whom another has made a mere assault with his fist, not with the intent to kill or do great bodily harm, and who is not deceived as to its character, is not justified in taking life or in using a deadly weapon in self-defense, while not entirely clear or accurate, is not misleading, where the jury is fully instructed on the subject of self-defense by other instructions.

ID.—JUSTIFIABLE HOMICIDE—EVIDENCE—ERRONEOUS INSTRUCTION.—An
instruction that homicide is justified when committed by any person
in the lawful defense of himself, when there is reasonable ground
to apprehend a design on the part of another to take his life, or to
do him some great bodily injury, and imminent danger of such
design being accomplished, but a person claiming such justifica-
tion if he were the assailant, or engaged in mortal combat, must
really and in good faith have endeavored to decline any further
struggle before the homicide was committed, is prejudicially er-
roneous, where the defendant had been violently and inexcusably
beaten in his own home by the deceased, who was a man of quarrel-
some disposition, and who, upon being ordered from the defendant's
house, apparently seized a deadly weapon and turned with manner
and language plainly indicating his intention to kill or seriously
injure the defendant.

APPEAL from a judgment of the Superior Court of
Plumas County, and from an order denying a new trial.
Stanley A. Smith, Judge presiding.

The facts are stated in the opinion of the court.

C. E. McLaughlin, and J. D. McLaughlin, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones,
Deputy Attorney-General, for Respondent.

BURNETT, J.—Defendant was charged with the murder
of Charles Cosker and convicted of manslaughter, and he
appeals from the judgment and the order denying his motion
for a new trial.

In pointing his contention that we should hold as a matter
of law that the conviction was unwarranted by the showing
made, appellant presents a fairly comprehensive and ac-
curate epitome of the evidence which we may substantially
reproduce.

It is admitted that defendant at his home killed deceased,
February 16, 1916. Deceased went to the home of defend-
ant about 7 o'clock in the evening, and together they went
to the house of one McKenzie, a short distance away. About
8 o'clock the two left McKenzie's, Cosker announcing that he
was going to the Chinese store with a present of pie and
bread for the owner. While at the store each had two drinks
of liquor. They returned to the home of McKenzie about 9
o'clock and, at their joint invitation, he accompanied them

to defendant's home. There they all drank liquor furnished by defendant, and Cosker occupied most of the time in lauding and reciting extracts from speeches of President Wilson. Several times he invited his two auditors to come to his house and read the speeches which he had cut out of the Sacramento Bee. Both declined the invitation, saying it was too late. McKenzie left defendant's house between 10 and 11 o'clock. But before he went away, according to the testimony of appellant, deceased had remarked that if he sold his mine he intended to go around electioneering for President Wilson, whereupon defendant laughed, and deceased "got a little sore" and said: "You and Rorey don't want to read these speeches; you are turncoats like Tom and Will." (Referring to his brothers.) Both answered "No," and Cosker continued with the speeches. The only testimony as to the circumstances immediately preceding and attending the tragedy was furnished by the defendant himself. He testified that, after McKenzie's departure, deceased continued to praise Wilson and his speeches until about 11:30 P. M., when he announced that he was going home. Defendant lighted a candle and they left the kitchen where they had been since their arrival at the house and went into the back room. When they reached the center of said room deceased repeated his invitation to defendant to come to his house and read the speeches. Defendant responded that it was too late, and that he did not want to awaken the wife of deceased. Deceased then caught defendant by the shoulder and started to pull him, scratching his neck in doing so. Then he "swung" on defendant, saying: "You and Rorey are G—— d—— s—— of b—— and I don't believe you want to read those papers," at the same time with his fist striking defendant in the face. The candle fell to the floor, and while defendant was picking it up deceased hit him again and knocked him down. A muzzle-loading shotgun was in a corner near where defendant fell, and he got it and ordered deceased to leave the house. As Cosker reached the back door he picked up something from where a lot of tools, including a blacksmith hammer, were kept. Defendant could not see what it was—his "eyes were dazed," and deceased stepped out on the porch and stood for a moment muttering, with his back to defendant, who said: "Charlie, you get out of here and go home; if you come back in here I will kill you,"

whereupon deceased said: "You s—— of a b——, I'll learn you whether you can draw a gun on me; it ain't loaded anyway," and swung around toward defendant with his right arm upraised, and defendant shot. Defendant could not see whether deceased had anything in his hand or not.

The blacksmith hammer was found in the snow about three feet from the right arm of deceased where the body was lying full length with his right arm outstretched, his feet close to the edge of the porch. Defendant's face was bruised, his eye blackened, and his face bloody. The hammer, according to defendant's story, was placed near the door by some boys a day or two before who had been using it in breaking ice.

The wound which caused the death of Cosker was on the left side of the neck, right over the collar-bone, nearer the front than the back of the neck. That was the only wound except one on the back of the right hand, about five-eighths of an inch long, crescent-shaped, which looked as if he had struck his hand against something and broken the skin.

The undertaker testified that from placing cotton in the wound to stop the blood he formed the opinion that its course was slightly downward toward the inside of the right shoulder. The body had been moved from its position in the snow to the home of deceased before this was done. Dr. Eckhardt testified that under these circumstances the course or direction of the wound could not be determined with any accuracy without a probe, and that no person by pushing cotton in with his fingers could determine with any degree of accuracy the direction of the wound.

Defendant and deceased were on friendly terms prior to the homicide, so much so that defendant had an appointment to cut deceased's hair on the following morning. Deceased was a larger and stronger man than appellant.

Thomas and William Cosker, brothers of deceased, and James M. Hayes were the first to reach the scene of the homicide. They testified that they did not see the hammer in the snow on that occasion, but Hayes and Thomas Cosker did observe it when they returned the second time. They were there the first time three or four minutes. The hammer was from two and a half to three feet to the left or westerly from the body. The witnesses admitted that they were more or less excited—which, of course, seems quite natural. Thomas Cosker testified that his brother's snow-

shoes were about fifty feet from the house, separated a little, and that the slope from the house to the point where they were found was downward. The snow-shoes were left outside of the house when McKenzie, deceased, and defendant reached the house.

The reputation of deceased for peace and quiet was bad.

Thomas Cosker testified that defendant came to his house about 11 o'clock on February 17th and knocked at the door, and when it was opened "he told me that he had killed Charlie and I said, 'What, you killed Charlie?' and he says, 'Yes, I shot him,' and then my wife says, 'What did you shoot him for?' and he said, 'Accident,' and I says, 'Accident be damned,' and my wife then made the remark, 'Oh, my God! What did you shoot him for?' and he said, 'I don't know, that damned gun,' and during that time he went away"; that when he reached the place he saw his brother's body lying face downward, McDonnell standing stride of him holding his head up, saying, "I shot him, I shot him." James Hayes asked him why he shot him, and he said, "Self-defense; if I had not shot him he would have shot me.' and I said, 'Get out, Dan; Charlie ain't got no gun and never owned one in his life.' Then he said, 'He was coming after me with a club,' and I made a motion with my hand, like this, and said, 'Show me his club; there is no club here,' and he never said another word, but I told him to get out of there and he put Charlie's head down and went into the house." He testified further that defendant, on the occasion of his second visit to the scene, said: "I shot him. Probably I will go to San Quentin for a few years, but that is all right."

William Cosker also testified that he heard defendant say, "I have killed him, I have killed him, and I don't give a damn if I go to San Quentin for a few years. It makes no difference." Other relatives of deceased gave similar testimony, but it is not necessary to repeat it. Some other witnesses, we may state, declared that defendant said: "If I had not got him he would have got me," and that he directed them to look around for the club or hammer used by deceased.

Appellant presents a critical analysis and comparison of the testimony of the various witnesses, and he argues, with force and persuasive eloquence, that the only rational con-

clusion is that defendant was entirely justified in the homicide. No doubt, a similar argument was made to the jury, but they were not convinced by it, as the verdict shows. As is manifest from the foregoing, much can be said in favor of appellant's theory, and has been well said by his counsel. We need not set out the reasons which he advances for his contention, although they have received our careful consideration. We deem it, however, proper to say that, in our opinion, for us to reverse the cause on this ground would be to usurp the exclusive function of the jury to pass upon questions of fact where there exists room for rational difference of opinion.

We cannot say there is no substantial support for the verdict, and that only one reasonable conclusion from the evidence could be drawn by sensible men. There was evidence —how credible it was for the jury to determine—which tended to discredit the testimony of appellant, and his manner when upon the witness-stand, of which we can obviously obtain from the record no accurate or complete portrayal, may have constituted a circumstance of great significance in the determination of his guilt or innocence. And it may be said that the recital of the facts by him while upon the witness-stand leaves some room for doubt whether, at the time he fired the fatal shot, he actually believed he was in imminent danger of receiving great bodily harm or of losing his life, or whether he may not have been somewhat moved by resentment in consequence of the brutal treatment he had received at the hands of deceased. We deem it unnecessary to notice any more specifically in this connection the record presented, but we are satisfied that this point should be resolved against appellant.

In *People* v. *Wright*, 4 Cal. App. 706, [89 Pac. 365], this court said: "It is true deceased had a few seconds previously fired at defendant apparently with the purpose of killing him, and defendant might, under the circumstances, have had reason to believe that deceased would continue the assault and that his only safety was to kill or disable deceased before the latter could again fire. There is evidence which would have sustained the jury in so finding. But these were matters for the jury to determine, and with their conclusion this court cannot interfere."

In *People* v. *Rongo,* 169 Cal. 75, [145 Pac. 1019], it is said: "Undoubtedly the defendant's own story exculpates him, but it was for the jury to say whether or not that story should be believed. The evidence was therefore sufficient to justify the verdict."

It is entirely clear that at least with equal propriety the same rule may be applied here. In a large proportion of such cases the defendant is the only surviving witness of the homicide, and beyond the mere fact of the homicide little additional evidence to the testimony of the accused can be secured. It is important, therefore, that there be no unwarranted interference with the prerogative of the jury to determine the weight of the evidence and the credibility of the witnesses, including the testimony of the defendant as well as that of any other witness. As to this, of course, the appellate courts are not authorized to substitute their judgment for that of the jury and of the trial court.

Appellant complains of the action of the court in refusing his proposed instruction as follows: "You are instructed that if the circumstances surrounding defendant at the time of and immediately preceding the killing were sufficient to arouse the fears of a reasonable man that deceased was about to inflict upon defendant great bodily injury or death, it is not essential that deceased should have had or attempted to use a weapon. Under such circumstances defendant was as much entitled to defend himself from great bodily injury from the hands of Charles Cosker as he was to defend himself from the use of a weapon or weapons in the hands of Charles Cosker."

Although somewhat hazardous to predict what courts may or may not hereafter declare, it may be, as appellant claims, that no court has ever declared, or will declare, "that a man has no right to defend himself against great bodily injury unless it is inflicted with weapons or instruments." Men undoubtedly have been permanently disabled, and even killed, by blows from the fists of powerful assailants, and the law justifies homicide under such attack or threatened attack, provided there be reasonable ground for apprehending death or great bodily injury. The court, however, so fully instructed the jury upon the subject that there could have been no misunderstanding as to the rule. The language, it is true, was somewhat general, but, without a strained construction, it

could not be said to limit the right of defense as apprehended by appellant. Several instructions of similar import were given, but it is sufficient to call attention to this: "Where one without fault is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit a felony or some great bodily injury upon him and to afford grounds for reasonable belief that there is imminent danger of the accomplishment of this design, he may, acting under these fears alone, slay his assailant and be justified by the appearances. And, as where the attack is sudden and the danger imminent he may increase his peril by retreat, so situated he may stand his ground, that becoming his 'wall' and slay his aggressor even if it be proved that he might more easily have gained his safety by flight."

Another conclusive answer to the proposition is that appellant's claim was that he was in danger from the use of some sort of weapon in the hands of deceased and not merely from his fists. In other words, the instruction was not applicable to any theory of the case based upon the evidence. It is true that defendant did not testify that he believed that deceased was about to assault him with a weapon—or at all, indeed—but that is the inference which he sought to create by the following statement: "When I stooped down to pick up the candle, he hit me again and as he knocked me down, I grabbed the shotgun and I said, 'Get out of here as quick as you can.' As he grabbed me he started to the door and he picked something up. I could not tell what it was—my eyes were dazed—and he stepped out on the porch with his back to me and I said, 'Charlie, you get out of here and go home; if you come back in here I will kill you,' and with that he said, 'You s—— of a b——. I'll learn you whether you can draw a gun on me; it ain't loaded anyway.' Then I shot and he fell off the porch." In his cross-examination he said deceased "swung around with his right arm" before the shot was fired. At any rate, it is quite apparent that appellant's theory was that he was in danger from the use of a deadly weapon.

At the request of the people the court gave this instruction: "Although the right to take life or use a deadly weapon in self-defense is unquestionable, yet, one on whom another has made a mere assault with the fist not with intent to kill or do great bodily harm, and who is not deceived as to its

character, is not justified in taking life or in using a deadly weapon in self-defense.'' It is said by appellant that ''This instruction, while taken from *People* v. *Romero,* 143 Cal. 459, [77 Pac. 163], does not state the law correctly for the reason that the right of self-defense depends in no degree upon the intent or will of the person slain.''

In the Romero case the only objection to the instruction was that there was no evidence upon which to base it and this was held to be untenable. The instruction is not entirely clear or accurate, and it probably would be better if it had not been given, but we do not think it could have misled the jury. It might be possible for a person to believe, and have reason to believe, that he was in danger of receiving great bodily harm from his assailant, although the latter had no such intention and the former was aware of it. However, in view of other instructions upon the subject of self-defense against apparent danger, the jury must have understood the law in relation to that particular feature. Besides, if erroneous, the instruction involved simply abstract error for the reason already suggested, that the theory of self-defense was based upon a threatened attack with a deadly weapon, and the instruction was not pertinent to the evidence.

Defendant's proposed instruction No. 13, as to the burden of proving justification, was undoubtedly covered by instructions which were given.

It is questionable whether the jury would have received much enlightenment from this proposed instruction: ''The jury is instructed that the words 'moral certainty' as used in these instructions is a state of impression produced by facts in which a reasonable mind feels a sort of coercion or necessity or necessity to act in accordance with it. It is that degree of certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it.'' It might be quite interesting and illuminating to a philologist, but it is believed that it would be of no benefit to the average juror. Indeed, the instruction as a whole seems to us somewhat uncertain and obscure, and while it would probably have done no harm, if it had been given, it is fair to say that it would have done no good. It is even doubtful whether Chief Justice Shaw's celebrated description of ''reasonable doubt'' is of any particular assistance in most criminal cases, but it is probably

as good as any that could be suggested.  After all, the intelligent juror reaches the conclusion that under the law it is his duty to convict if he is thoroughly convinced and entirely satisfied of the defendant's guilt, and if not, it is his duty to acquit, and we would save trouble and confusion if we would refrain from much of our learning and refinement about these terms, and confine ourselves to such simple and comprehensible statements of the duty of the jury as just indicated.

The proposed instruction of appellant as to the burden of proof of the prosecution, and the right of the defendant to act upon appearances and his privilege to stand his ground, were amply covered, we think, by other instructions given by the court.

Probably the most serious question arises out of the action of the court in giving this instruction: "Homicide is justifiable when committed by any person in the lawful defense of himself, when there is reasonable ground to apprehend a design on the part of another to take his life, or to do him some great bodily injury, and imminent danger of such design being accomplished, but a person claiming such justification if he were the assailant or *engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."*  The objection is directed to the portion we have italicized and appellant argues: "This instruction is erroneous because it states that not only the assailant but one who is engaged in mortal combat must decline further struggle before the homicide is justifiable.  This, of course, is not the law.  The instruction was harmful in this case because of the attitude and argument of the prosecution."  Then he quotes from the transcript certain questions addressed to appellant as to why he did not close the door and go into the kitchen, and his answers thereto, and the assertion is made that the prosecution argued before the jury that it was the duty of McDonnell to retreat to the kitchen and close the door, or to attempt to close the outer door.

The attorney-general answers that the instruction is in the language of the statute, subdivision 3, section 197, of the Penal Code, and that it was held to be a correct statement of the law in *People* v. *Herbert,* 61 Cal. 546.  Therein the history of said subdivision is given, and it is declared that

it is no new statement of a legal principle for the first time. stated in the codes, but that it follows the Crimes and Punishment Act of 1850, and has been the law ever since. As far as the said opinion is concerned, though, it is apparent that the point before us was not made. The attention of the court was occupied in considering the question whether the instruction required the existence of absolute necessity to justify or excuse the homicide, or whether it was consistent with the doctrine that the slayer could act upon appearances, provided they were such as to create a reasonable apprehension that there was design to take his life or to inflict upon him great bodily harm. This is made manifest by the quotation therein from the case of *Shorter* v. *People,* 2 N. Y. (2 Comst.) 193, [51 Am. Dec. 286], wherein the court of appeals of New York, through Bronson, J., learnedly discusses the question of self-defense.

It might be said, also, although the point was not considered, that since the evidence was not before the supreme court, the instruction, if erroneous, could not be held on the record to be prejudicial.

Manifestly, there is force in the contention that an instruction taken from the statute should not be condemned. Ordinarily that is true, and within certain limits the legislature may prescribe the conditions under which homicide may be excusable or justifiable. It cannot, however, deprive a person—at least a person who is not a wrongdoer—of the right of self-defense. The right to defend life is one of the inalienable rights guaranteed by the constitution of the state. (Art. I, sec. 1.) It is plain that if a person without fault is assailed by another and a mortal combat is precipitated, to require the former to attempt to withdraw before killing his adversary is to require the very thing that may prevent him from defending himself at all. The instruction is quite capable of the intepretation that although the defendant was without fault and the deceased was the aggressor, yet, if they were engaged in a mortal combat, it was the duty of the defendant to endeavor to withdraw before killing his adversary, although he had reason to believe, and did believe, his life was in imminent danger, and that to attempt to decline further struggle would increase his peril and probably enable his adversary to kill him. Such, of course, was not the intention of the learned trial judge in

giving the instruction nor, probably, of the legislature in enacting the law, but it is capable of such interpretation and may have been so interpreted by the jury.

To appreciate the probable prejudicial effect of the instruction we must, of course, view the evidence from appellant's standpoint. We must, in other words, assume that the jury believed his story, since there is nothing inherently improbable about it. We then have this situation: Appellant had been violently and inexcusably beaten in his own home by a man of quarrelsome disposition. He had ordered his antagonist to leave the house, and had told him he would kill him if he attempted to return. Deceased apparently seized a deadly weapon and turned with manner and language plainly indicating his intention to kill or seriously injure defendant. Under those circumstances said instruction would demand the conclusion that it was still the duty of defendant to withdraw or retreat before firing the fatal shot. But if such condition existed defendant, under any proper view of the law, was not required to retreat, even though it would not have increased his peril. He had a right to stand his ground and to slay his adversary if he believed he was in imminent peril.

In *People* v. *Lewis,* 117 Cal. 186, [59 Am. St. Rep. 167, 48 Pac. 1088], it was held that "the tendency of the American mind is against the enforcement of any rule which requires a person to flee when wrongfully assailed, to avoid chastisement, or even to save human life; and it seems that a true man, who is without fault, is not obliged to flee from an assailant who, by violence or surprise, maliciously seeks to take his life or to do him enormous bodily harm." And, furthermore: "A person assailed in his own house, or upon his own premises, has the right to stand his ground, and is not bound to retreat or escape to avoid the assailant, but may kill him if reasonably necessary for his protection from great bodily danger in the position rightfully occupied by him on his own premises, even though he might avoid the assault by fleeing or withdrawing therefrom." In that case it was held prejudicially erroneous to instruct the jury in reference to the defendant that "if he could have withdrawn from the danger it was his duty to retreat," and that "between his duty to flee and his right to kill, he must fly, or as the books have it, 'he must retreat to the wall.' " There are

other decisions to the same effect but they need not be cited. As to whether appellant was engaged in a mortal combat, according to his story, and in view of the tragical ending of the affray, there can be no doubt.

We think, under the peculiar facts of this case, the giving of this instruction should be held to be prejudicially erroneous, and that the evidence of defendant's guilt is not so strong and convincing as to justify us in saying there was no miscarriage of justice.

What the legislature probably intended to provide is that where one *as the assailant* is engaged in a mortal combat he must endeavor, etc., but the language chosen is not apt for that purpose.

It is true that the jury was also correctly instructed upon the subject, but that simply produced an irreconcilable conflict, and we cannot say which instruction was followed.

The judgment and order are reversed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 4, 1917.