[Crim. No. 1965. Second Appellate District, Division Two.—July 25, 1930.]

THE PEOPLE, Respondent, v. PASQUALE BRUNO, Appellant.

C. B. Conlin and S. Jack Cohen for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman, Deputy Attorney-General, and Warner I. Praul for Respondent.

GATES, J., *pro tem.*—In this case appellant was convicted of murder in the second degree, upon an information charging him with murder. He was tried by the court, having waived trial by jury. From the judgment of the court and from the order refusing a new trial he appeals.

The killing, which was admitted, is claimed to have been done in self-defense. The facts of the case are that appellant shot and killed Manuel Herrerra on the first day of January, 1930, at about 1:30 o'clock in the morning. Due to appellant's claim that the evidence conclusively

shows that the killing was in self-defense, we will give a somewhat extended statement of the salient facts.

Connie Herrerra, daughter of the deceased, testified that she saw the appellant at about 8 o'clock on the evening of December 31, 1929, at her home on Bartlett Street, Los Angeles, she and her father being present and her uncle having just left as appellant came in; that she had been invited to a dance that evening at her grandmother's; that appellant asked her if he could be invited to the party; that he also asked her if he could take her to the dance, and that her father replied that he could not. After further conversation with appellant the witness proceeded to drive to North Figueroa Street, where the party was to be held; that appellant followed her and her uncle to the party and went into the house, where he proceeded to greet the various guests. As appellant and Miss Herrerra were leaving to get several girl guests who were coming to the party, appellant said to Herrerra, now deceased, "I forgot to give you your Christmas, but I think I will give it to you tonight." Appellant left and the witness did not see him again until about 12:15, at which time he was at the dance. After he had danced several numbers he left. The next time she saw him was 1:15, at the same place. At this time appellant approached her father and said to him, "Manuel, shake hands like a best friend"; that the latter refused to shake hands with appellant; that at that time her father swore at appellant, whereupon Bruno, the appellant, said if he was a man to come outside and fight with him like a man; that as her father, who was very drunk, tried to go after Bruno, her grandmother and three men took him, appellant, through the front door; that neither her father nor appellant hit the other; they never touched each other; that they took appellant to his car, which was parked in front of the house where the dance was being held; that she stood by him for about 10 minutes, begging him to go away; and that at that time he said, "If your father comes out, I will kill him." After further conversation with appellant, preparatory to his leaving, the witness testified that her father came out of the back door of the house; that when appellant caught sight of him he said, "Here he comes, I will get him now"; that she kneeled down and begged him not to kill her father; that after her

father heard her voice, as he was going up the hill, he said, "Concha, Concha, where are you?" That he "came toward us," walking north; that she ran to meet her father; that when the latter was about ten feet away appellant fired the first shot; that her father said, "Get out of the way, Connie, before he shoots you"; that when he was about five feet away appellant shot at her father three more times; that the three shots were fired one after the other; that her father fell dead, and that she ran into the house. The witness further testified that she saw appellant's gun the first time that evening at about 12 or 12:15, at which time the latter told her that it (the gun) was his best friend. On cross-examination the witness testified that appellant was a frequent visitor at her home; that he brought whisky there twice a week for a period of nine months; that neither the appellant struck or touched her father, nor her father, the appellant; that she saw no knife on her father.

Mrs. Amelia Rodriguez, sister-in-law of the deceased, who attended the party on the night in question, among other things, testified: That she took Bruno out of the house; that she grabbed him by the arm and asked him to leave; that she and another took him to the street; that she told him not to kill Manuel; that he did not answer—would only pull out the pistol and then put it in again; that it was a big pistol; that appellant crossed the street where his machine was; that when Manuel crossed the street appellant took his pistol out again; that she told Bruno to go home because he had a big family and that Manuel had a big family, and not to do anything; that she saw Manuel approach, and as he was coming, walking "regular steps," she saw Bruno take out his pistol; that she was scared, saw no more, turned around and stopped her ears and ran inside of the house, where she fell and fainted.

Another witness, Hope Garcia, who was sitting in a car at about the time of the homicide, stated that she saw Connie's aunt and Bruno come out, heard the former call Connie and that Connie came from the house as two men were coming out; that one was Connie's father; the other man tried to take something from Manuel, which she didn't see, and they passed on; that after that she heard the shots.

David Miramates, called by the People, testified that he was present at the dance; that he heard the shots; that he went out of the house and saw the two, one on the ground and appellant going in his machine; that he asked Bruno if he had killed him; that the latter said "No"; that he asked him who ·had killed him and he said he did not know; that he "put" him (Bruno) down in the street; that Juan Campos came to help him.

The county autopsy surgeon, Dr. Wagner, testified as to the four bullet wounds found upon the deceased; that the wounds, upon the chest and abdomen, caused the death; that each, independently, would most probably have been fatal.

Police Officer Altig, called by the People, stated that he arrived at the scene of the killing shortly after 2 o'clock in the morning; that he saw two men lying on the street— one on his back, apparently dead, the other on his stomach, calling for help; that appellant was the one lying on his stomach. On cross-examination he testified that Herrerra was lying on his back with his head pointing downward— down the hill; that he saw a table knife, blade pointed upward, almost out, in the right hip pocket of deceased. This knife, as described by the court, was an ordinary appearing knife of the dessert knife style, with metal handle and ordinary metal blade; in general shape and contour an ordinary table knife, that is, a rounded point to it; the knife had no edge—it was not sharp. On cross-examination the witness testified that appellant was lying on the ground ·wiping the blood off his face with a towel or handkerchief; that he groaned and called for help; that he, the witness, asked Bruno a number of times after he was taken to the hospital if he had killed Herrerra, and that he denied it.

L. E. Sanderson, a witness for the People, testified that at the hospital defendant gave a version of what happened. A repetition of this statement will serve no useful purpose, as substantially the same statement was made by appellant before the trial court.

C. B. Conlin, who is an attorney at law, testified for the defendant as follows: That Mrs. Herrerra and appellant were, together in his office about the middle of December; that Bruno stated to him in the presence of Mrs. Herrerra

that she was going to give him $150 and that he wanted the witness to prepare a note for that sum for him to sign; that he prepared a note in favor of Mrs. Herrerra and that Bruno signed it; that Mrs. Herrerra thereupon laid $150 on the desk and that Bruno picked it up and counted the witness $140; that about a month or six weeks afterward he was called up in reference to the note; that the party on the telephone said he was Mr. Herrerra, and that he, Conlin, had taken $150 from Herrerra's wife; that "Patsie" Bruno had not anything to do with him, and that if Bruno and he, Conlin, did not give back the $150 he would fix them. That about December 20th, 21st or 22d he communicated this conversation to Bruno. The witness also testified to a second conversation at his office with Herrerra regarding the return of the money; that the latter seemed very excited; "he said he would fix us" if we did not return the money. Mr. Conlin further stated that he communicated these conversations to appellant, who said that he, Conlin, need not be scared about it because he would not cause any trouble—that they had been partners in the liquor business.

Appellant took the witness-stand in his behalf and testified substantially as follows: That he was invited to the party by Mrs. Herrerra; that he went there about 10:30 that evening; that after the whistles blew, midnight, he went into the kitchen and greeted Manuel Herrerra, who in turn swore at him, calling him bad names; that later, when they started to dance, Amelia Rodriguez told him to go because Manuel was drunk; that as he started to go away the while opening the door Herrerra struck appellant behind; that he had a big knife in his hand; "he stabbed me right here"—indicating two inches below the left shoulder blade; stabbed him once; that he, appellant, then ran to his car across the street, which was parked about 150 feet away; that Amelia Rodriguez went with him; that he started to go home, turned his head around and Amelia started to go back; that Concha—Connie—was in front of the door, holding her father; they were on the front porch; that Concha waited on the front porch and Manuel came "along my way"; that Concha held the right hand of her father, who had a big knife in his hand; that "he came to me, about ten feet away"; "I shot him the first time in the

feet and tried to stop him, but he still kept coming my way." "I shot him—was about 4 or 5 feet, close by me. He already had the knife in his hand, he tried to kill me." Appellant then testified that he shot Manuel because he wanted to kill him. He also narrated the incident about the money, concerning which Mr. Conlin testified. He further stated that he did not fall at the first shot, but that after the three shots he fell in front of the car.

On cross-examination he testified that at the time he was stabbed he was in front of the door; that it was done with a big knife about fourteen inches long; that he was told at the General Hospital that he was stabbed to a depth of a little over an inch; there was blood on his back; that he did not know if there was blood on the floor, as it was dark; that Herrerra was eight or nine feet away the first time he shot him; that he never saw the knife Manuel used in the house; that Concha was not beside her father when he was shot; she was on the porch; that she stayed at the door during all of the shooting; that Manuel broke away from his daughter and Amelia Rodriguez and came toward appellant, and that Concha went back in front of the porch again; that Amelia left when he fired the first shot. Then the witness described what happened thereafter—how he was struck and jumped upon; that he was not afraid when Mr. Conlin told him about what Herrerra said; that he was scared at the time because Manuel had a knife; that he was not afraid before that time; that Herrerra was drunk at the time; that he did not see where he took the knife from; that when he stabbed him Manuel did not say anything; neither did he; that he had been on the front porch a second before he was stabbed. The witness denied having threatened to kill Manuel or that Concha pleaded with him not to kill her father.

In rebuttal Amelia Rodriguez testified for the People. She stated positively that Manuel did not stab appellant; that Bruno made no explanation; that she did not attempt to hold Manuel by the arm as appellant was going across the street, because she had the defendant by the right arm at the time; that Herrerra did not follow Bruno across the street; that there was no blood on the floor or any part of the house.

A doctor was called by the People, who described the injuries to appellant. He characterized the wound on appellant's back as a clean-cut wound, which had apparently been inflicted by a sharp-edged weapon.

Appellant's sole contention is that the evidence does not support the judgment, for the reason that it clearly appears that he shot the deceased in self-defense.

There is a sharp conflict in the evidence. If the trial court had believed appellant's story and found from the evidence that the actions of the deceased were such as to justify the appellant in taking his life, the court should have acquitted him. From the judgment of conviction it is apparent that the court did not believe appellant's version of the tragedy, but believed the eye-witness to the crime, as well as the other witnesses produced by the prosecution. The law is well settled that disputed questions as to whether a plea of self-defense is sound or is corroborated are for the jury to determine. (*People* v. *Hecker*, 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307]; *People* v. *Musumeci*, 51 Cal. App. 454 [197 Pac. 129]; *People* v. *Brown*, 15 Cal. App. 393 [114 Pac. 1004]; *People* v. *Webster*, 13 Cal. App. 348 [109 Pac. 637]; *People* v. *Benning*, 84 Cal. App. 168 [257 Pac. 903].) If the testimony of the People's witness, Miss Herrerra, was worthy of credence, and the trial judge evidently thought it was, the conduct of appellant before the commission of the homicide indicated a premeditated intent to kill the deceased. As shown by the record the latter stated to her: "If your father comes out I will kill him"; and later: "Here he comes; I will get him now"; and he remained on the premises even after the pleadings and importunings of the daughter and her aunt. While it is true that it is not clear as to how the appellant received the stab in the back, it plainly appears, from the testimony of Mrs. Rodriguez, who was present when the parties left the house, that the wound was not inflicted by the deceased. This is also corroborated by the fact that there was no blood upon the floor or upon the deceased when he left the house.

Where there is substantial evidence to support the judgment it will not be disturbed, unless vitiated by some erroneous ruling of the court. (13 Cal. Jur. 633; *People* v. *Grimes*, 132 Cal. 30 [64 Pac. 101]; *People* v. *Anderson*,

57 Cal. App. 721 [208 Pac. 204]; *People* v. *McDonnell*, 32 Cal. App. 694 [163 Pac. 1046]; *People* v. *Shimonaka*, 16 Cal. App. 117 [116 Pac. 327].) The rule is tersely stated in *People* v. *Webster, supra*, as follows: "Whether the killing of deceased was done in self-defense was a question peculiarly for the jury, and it is not our province to interfere with their verdict. Under such circumstances the verdict of the jury is final and conclusive. (*People* v. *Emerson*, 130 Cal. 562 [62 Pac. 1069]; *People* v. *Stokes*, 11 Cal. App. 759 [106 Pac. 251].)" So in the present case it was for the court to determine who was telling the truth and to conclude whether the plea of self-defense was sustained. This it has done and there is ample evidence to support its findings. We cannot disturb the conclusions upon the present state of the record.

Judgment and order affirmed.

Works, P. J., and Craig, J., concurred.