[Crim. No. 2307. Second Appellate District, Division Two.—March 29, 1934.]

THE PEOPLE, Respondent, v. JULES H. ROTH, Appellant.

Richard H. Cantillon for Appellant.

U. S. Webb, Attoney-General, Warner I. Praul, Deputy Attorney-General, Buron Fitts, District Attorney, Willard Burgess, Deputy District Attorney, and John W. Loucks for Respondent.

ARCHBALD, J., *pro tem.*—From judgments of conviction entered on verdicts of guilty returned by the jury on seventeen counts charging grand theft and four counts charging violations of the Corporate Securities Act, and from orders denying his motions for arrest of such judgments and for new trials, defendant has appealed.

The evidence shows that defendant at the age of twenty-one made a business connection with C. C. Julian and continued in such business until December, 1924, at which time they transferred to S. T. Lewis fifty-one per cent of the voting stock of the Julian Petroleum Corporation, providing Lewis would pay to such corporation within ninety

days the sum of $3,000,000. The corporation named was indebted to Julian and defendant in the sum of approximately $1,300,000, which indebtedness was finally settled for $300,000. In February of 1927 defendant organized a Nevada corporation named J. H. Roth & Company, which was licensed to conduct a brokerage business in California. Such license was revoked July 27, 1929, and after that date no certificate to act as a broker was issued to such corporation or to defendant. The company leased space at No. 651 South Spring Street, Los Angeles, and spent some $37,000 in improving the premises, opening for business on April 12, 1927. Mr. James C. Battle was introduced to defendant by Julian, and became secretary-treasurer and attorney at a salary of $1,000 per month, of which he was to use $400 per month in the purchase of stock of the corporation. Battle remained with the company some time but none of the corporate stock so purchased was ever issued to him. Two other men were induced to put in $13,000 and $25,000, respectively. The first was never able to secure the stock or to see the stock book; the second was issued 500 shares. Both withdrew and brought suit to recover the amounts so invested. Defendant was made president of the concern but no stock was issued to him, and the qualifying shares in the names of the incorporators were indorsed in blank and remained at all times in the stock book, which was kept in the possession of defendant.

After about two years defendant and his private secretary were the only active directors present on the few occasions a meeting was deemed necessary by defendant, and the latter was apparently the only one having any voice in the management of the concern. In June of 1929 the company began selling stock under what is known as the twenty-payment plan. It did not have a seat on any exchange, but opened accounts with houses which did, under the names of the cashier, Miss J. Jadwin, and O. S. Witherall, defendant's secretary, who was not connected officially with the corporation. Mr. Conway Beavans was bookkeeper and Mr. William J. Howell the sales manager. The company did not prosper and attachments were being run by one of the suing stockholders. Another serious complication was the taking of the books of the corporation by the district attorney under a search-warrant and *subpoena duces tecum*

in November, 1929. In December of that year defendant caused a new corporation to be organized under the laws of Nevada, called "Security Investment Counselors, Inc.", with a capital investment of $500. This company was to pay the former corporation $25,000 for the lease at 651 South Spring Street, $12,500 for the fixtures and $30,000 for the assignment of contracts to purchase stock. On December 21, 1929, 363 of such contracts were assigned to the new corporation, with balances due from the purchasers of $207,859.88. The market value of the stocks called for by such contracts on that day was $213,759.76, and dividends had accrued of $2,286.35. In other words, the obligations assumed by the new corporation on such contracts amounted to $8,186.22 more than the total amounts that would be paid in by the contract holders if they completed their payments, and the securities transferred to the new corporation aggregated in value but $1334.75. The financial condition of the corporation at the outset, considering the obligations assumed and its capital, was bad.

Defendant did not appear as a director or officer of the new corporation for very obvious reasons, but the bookkeeper and cashier were the same as before, and Mr. Howell, sales manager of the former concern, was made vice-president and general manager, leaving the corporation, however, about four months after its organization because of a disagreement with defendant. Apparently defendant's was the only voice of authority in this corporation from its organization, although to the public at large he seemed to have no interest in it. The income of the concern in 1930 was $49,477.16 and its expenses $101,655.72. The items of expense do not include the sum of $35,387.10 paid defendant for his personal use, nor the portion of the so-called "suspense" account aggregating $38,550, which was withdrawn in cash and given defendant by his private secretary or the cashier. The income in 1931 to the date in March when a transfer was made to another corporation, as hereinafter mentioned, was $8,618.66, with expenses of $20,318.02.

The new corporation, like its predecessor, had no broker's license or certificate, nor any trading account with brokerage houses, but in its dealings with two or three such concerns it used the name of its cashier, a Miss Engle, and the fictitious name of Nickle. About the middle of 1930 de-

fendant attempted to dispose of the remaining accounts of J. H. Roth & Company and also of Security Investment Counselors, Inc., but without success. The lease above referred to was finally disposed of for approximately $7,000 and the use of the premises while alterations on the building were in progress. About March 20, 1931, the remaining accounts of the Security Investment Counselors, Inc., were transferred to the Coast Investment Corporation, Ltd., which had been doing a similar line of business and had a broker's license, some twenty-five accounts and the sum of $2,605.94 cash in bank. The deal for the three issued shares of the capital stock of the Coast Investment Corporation was made by one J. H. Williams, who was a salesman and had been acquainted with defendant for ten or twelve years. There is evidence supporting the conclusion that the suggestion to make the deal came from defendant, that he was the one interested in it and that Williams had no interest other than the salary he drew, which was fixed by defendant. The owners of said three shares of stock were paid the sum of $2,625, or but $19.06 more than the cash in bank of said Coast Investment Corporation. Williams testified that such shares were indorsed in blank by the former owners and placed in the minute-book, or with the papers, and that it was his understanding that defendant "held it all"; that he had no agreement with defendant as to a division of the same.

There were 366 contracts transferred by Security Investment Counselors, Inc., to the Coast Investment Corporation. The latter concern was to make collections and turn the money over to the former, which was to deliver the stock to the Coast Investment Corporation to cover any contracts completely paid. The latter company received from Security Investment Counselors, Inc., to meet the undelivered stock value of $132,814.72, the following: Securities, $2,125.52, collateral securities deposited by customers, $4,700.39, and balance due on customers' contracts $70,699.65, or $55,289.16 less than the amount required to make deliveries if all contracts were completed. Miss Jadwin was cashier, secretary and treasurer of the Coast Investment Corporation and Mr. Williams the nominal president—but, as he says, without any interest in it—and the brokerage accounts were handled in the name of defendant's private

secretary. Leonard Ross, who was "special messenger" for J. H. Roth & Company and also for Security Investment Counselors, Inc., acted in the same capacity for Coast Investment Corporation. Just prior to the filing of an involuntary petition in bankruptcy against this latter concern, Mr. Williams, on the instruction of defendant—who told him the company "was in jeopardy, and to protect the assets of the company"—took everything that was left in the office of the company in the way of stocks, bonds and securities, put them in a suitcase and sold them for approximately $500, which he delivered to defendant. The trustee in bankruptcy of the defunct corporation realized from the remaining assets $105, which was claimed by holders of lease contracts.

When the case was first called for trial on May 3, 1932, defendant was missing, and his bail was promptly forfeited. The evidence shows that he had walked out of the courtroom through the judge's chambers, got into a cab and made his way to Canada; that he was arrested there on telegraphic warrant but was later released; that he was discharged "because the secretary of state did not inform the Canadian officials that he was wanted as a fugitive from justice"; that he subsequently walked across the international line into the United States dressed as a farmer and drove with some friends to New York, where he was arrested and extradited to California. Both in Canada and in New York defendant lived under assumed names, dyed his hair and wore a mustache and glasses to disguise himself. Police officers of Los Angeles called on defendant before the Coast Investment Corporation failed and told him they were hearing complaints about the companies above mentioned and that some day someone would have to answer them. Defendant at that time informed them that he "was just working there, . . . not signing any checks and not an officer of the company".

Count I of the information charges the felonious taking of $300 *in money,* the property of Mrs. R. F. S. Wurdemann. Mrs. Wurdemann testified that she left fifty shares of Southern California Edison Company stock owned by her with J. H. Roth & Company for sale when ordered by her. The agent she saw tried to interest her in buying stock on the twenty-payment plan, without success. She

indorsed her certificate and left it with the agreement that it would not be transferred out of her name or used, but was to be kept in the company's safe. Defendant caused this stock to be left with the Commonwealth Securities Company the next day as additional security for a loan of $1500, and later $300 more was advanced. The shares were sold without instructions from Mrs. Wurdemann on October 16, 1929, at $79.25 per share, or a total of $3,962.50. The stock was entered on one ledger sheet as "collateral". Another ledger account was kept identical with the first, except as to the sale. This latter shows a sale on October 29th at $55 per share. This account was not found in the books of the Roth Company but in an envelope taken from defendant's private desk at the time of his arrest. The stock advanced to $90 a few days after it was left by Mrs. Wurdemann, and she telephoned Mr. Howell of the Roth Company, with whom she had dealt, to sell it. He urged her not to do so, as he expected it would go to $100, and she did not order it sold. Later it began to decline, and on October 16th she visited the office and asked for her stock. Howell then tried to interest her in the purchase of some other stock, with her stock as collateral, until the price was paid. She told him she would consider the proposition and to retain the stock (already sold, unknown to her) until further notice. On October 17th Howell telephoned Mrs. Wurdemann and told her the market was stiffening, urging her to complete the deal he had theretofore proposed. At that time she was assured that her stock would not be transferred and that it was being kept in the safe as agreed. Mrs. Wurdemann again declined to accept the deal. Two hours later she was again called and urged to accept. This time she agreed to do so and consented to have her stock posted with the company as security for the new purchase. No purchase on margin was intended by her, as she thought she was making an investment. No margin was requested until October 28th at 7:30 P. M., when Howell telephoned her. She went to the office the next morning and was told her account was short $703.18, and that the condition of the market did not warrant putting up additional collateral. On October 30th, Mrs. Wurdemann received confirmation of the sale of all her stock, including the Edison certificate, which was purported

to have been sold at the rate of $55 per share. The ledger sheet of the company accounting for the sale at $55 shows a debit balance due the company of $726.21. It will be seen that if she had been credited with the amount at which the stock actually was sold, the company would in fact have owed her $607.54, in spite of her disastrous bargain.

▮ As to count I the court instructed the jury that defendant could be found guilty only on the theory of embezzlement. Appellant urges that the evidence may show an embezzlement of the stock but that it does not show the embezzlement of money. In our opinion the jury might have found an embezzlement of the stock, which, however, was not alleged, but we think it also supports the charge made in the information. Under the evidence the Roth Company was entrusted with the certificate of Edison stock to be sold for Mrs. Wurdemann when she was satisfied with the market price. It was her agent for that purpose. Not only was the certificate converted by selling the same contrary to her orders, but having done so the company did not account to her for the full sale price but attempted fraudulently to convert a part of the proceeds realized on such sale by falsely reporting a sale at $55 per share. In our opinion a case of embezzlement of such proceeds was made under both sections 484 and 507 of the Penal Code. "All former elements of this offense are perpetuated and contained in section 484 as amended." (*People* v. *Myers*, 206 Cal. 480, 483 [275 Pac. 219, 220].)

The remaining counts charging grand theft upon which verdicts of guilty were returned involve sales to ten different customers under the twenty-payment plan. Two of the counts, VII and XX, involve contracts issued by J. H. Roth & Company, thirteen of them, IV, V, VI, VIII, IX, XI, XII, XIII, XIV, XV, XVI, XVII and XVIII, contracts issued by Security Investment Counselors, Inc. Several of the contracts were signed by defendant, and in addition to that already set out there is other evidence which in our opinion amply supports the implied finding which the jury must have made, viz., that the three corporations were owned, controlled and directed by defendant, and were in fact the instrumentalities through which he did business.

▮ Appellant urges that there is no evidence to support the charge of grand theft, and points to the purchase of

stock by him through various corporations and the completion of some contracts by the delivery of stock, as well as certain printed matter set out on the back of the contracts, as evidence thereof. Such printed matter is contained in 21 paragraphs consisting of 81 lines of small five-point type, covering the entire back of the $7\frac{1}{4}$-inch by $8\frac{1}{2}$-inch sheet, with the exception of narrow margins at the top, sides and bottom. Such printed matter provides in part that actual delivery of the securities contracted for is contemplated; that the relation established between the ''seller and buyer'' is that of debtor and creditor and not that of principal and agent, and that all payments made by the ''buyer'' and any securities deposited with ''seller'' shall immediately become the property of the latter, as well as containing many other provisions skilfully designed for the protection of the seller and which we cannot take the space to mention, let alone set out in full. The face of the contract, in ten-point type, addressed to the selling corporation, recites the initial payment made on the described security ''in accordance with the terms set out on the reverse side hereof for a total of $——'', which price includes five per cent of the total purchase price added ''as your Investment Counsel fee'', which the company was authorized to deduct out of the first payment. The contract then provided: ''I agree to pay the balance in 20 equal installments, *plus 7% carrying charge on deferred payments,* due and payable . . . on the —— day of each month. This instrument (including printed matter on the reverse side hereof) which the undersigned has read and agrees to and hereby makes same a part hereof, constitutes the entire agreement between us.'' (Italics ours.) Then follows a place for signature and address of ''buyer'', and an acceptance to be signed for the company.

We have found in the record testimony of but one contract holder to the effect that he read the fine printed matter on the back, which he did ''at or about the time'' he signed it. This same witness testified he was informed at the time the initial payment was made ''that the stock would be bought, and when I had finished my contract it would be delivered to me. That was why I was paying my seven per cent interest on the money I was paying in''. Other witnesses testified to the same understanding, and

the contract on its face certainly would lead the buyer to believe that such was the intention of the seller, regardless of the printed matter on the back which they apparently did not read. In our opinion the printed matter on the back, relied on by appellant, at the most simply created a conflict for the jury to determine, not only with the testimony of the purchasers and other testimony challenging the good faith of defendant, but with the faces of the contracts which they signed. The evidence shows that the payments made by the purchasers were not used to buy the stocks contracted for, and that none of such purchasers received any stocks, although several had completed their payments and the others testified that they kept their payments up until the receiver in bankruptcy closed the office of the Coast Investment Corporation, and none of them received any of their money back.

Nor do we see any merit in the claim of appellant that as the time for delivery had not been reached on these latter contracts when the doors of the Coast Investment Corporation were closed there is no evidence to show that defendant had no intention of performing such contracts. That was a circumstance for the jury to consider with the other evidence indicative of such an intent.

Richard R. Nance gave an order to the Coast Investment Corporation to buy 200 shares of Standard Oil of California stock at $42.50 per share on March 26, 1931, making a deposit of $7,500 with the agreement that the stock would be delivered within twenty-four hours. He later called the office on the telephone and talked with Mr. Williams, the nominal president of the company, who told him there was delay in the delivery from New York. On the 16th of April he was told that the company had the stock and would deliver it upon payment of the balance due. Mr. Nance paid the balance by check dated April 17, 1931, and talked with Mr. Williams again later, who said "it will be here in a day or so now". April 18th he left for Nevada on business and when he returned he went to the office of Coast Investment Corporation, but Mr. Williams was not in. Two or three days thereafter he called again and found the receiver in charge. The evidence shows that Miss Jadwin, the cashier, bought a cashier's check with Mr. Nance's $7,500, cashed it and put the money in the office

safe, paying it out on the direction of either defendant or Mr. Williams.

The evidence also shows that out of 835 closed contracts on only 110 was stock delivered; that with 69 contracts for the purchase of 5,190 shares of Fox Theatre stock Security Investment Counselors, Inc., purchased 750 shares, and with 65 contracts for the purchase of R. K. O. stock but 45 shares were bought. The jury might well have found that just enough was purchased to keep up a fairly respectable front and create a feeling of security, or to satisfy insistent dissatisfied purchasers who could not be persuaded to reinvest; that there was no intention at any time on the part of appellant to furnish stock to any of the purchasers, but that it was his plan, when a buyer had about completed a contract, to get him to purchase other stock, applying the book credits then accrued as first payment and thus to keep the payments coming in, as far as possible, by high-pressure salesmanship, in the hope that the constantly falling market would eventually wear out the discouraged purchaser and make it unnecessary for appellant to buy stock even at the greatly depreciated prices, and that he only settled with buyers like the witness Baumgartner, who had paid some $600 into the Security Investment Counselors, Inc., on his contract when he received notice of the transfer to the Coast Investment Corporation. Baumgartner ordered his stock sold and demanded the difference. They tried to prevail upon him to hold the stock but he insisted on a settlement. They said it would take a week or ten days to deliver the stock in New York and get the money back. He then called up the office and told them if they did not settle he would notify the district attorney, and in a day or so he received his money.

The evidence in our opinion justified the implied finding of the jury that the respective corporations, doing business in luxurious offices, with the easy payment contracts, afforded appellant a very attractive device for drawing customers without adequate means who wanted to start saving by investing in stocks that seemed to assure profit and security, and who under the contracts were willing to pay seven per cent interest on the money they expected appellant would lay out to buy the stock for them, and that he intended to use the payments made in so securing said

stock and in reducing the amount he advanced and upon which they were paying interest, whereas in fact he had no intention of buying such stock at the time, or at any time, unless he was forced to do so by insistent suspicious customers, but intended to use such payments for his own purposes and not for the purposes for which the customers paid in their ·money.

█ The court instructed the jurors in substance that as to counts IV to IX and XI to XX, inclusive, under the pleadings and evidence a verdict of guilty upon the theory of embezzlement would not be justified and that there was left as to such counts for their consideration the question as to whether they believed, beyond a reasonable doubt, that the crime, if any, was shown to have been committed by means of larceny or by means of false and fraudulent representations and pretenses. Appellant urges that the record does not in any way support the theory of obtaining money by false pretenses and that the court erred in giving such instruction. In our opinion the provisions of the contract, leaving out of consideration the fine print on the back thereof and the testimony of some of the witnesses as to what use was to be made of their money, furnish a basis for such theory, and we see no error in the giving of such instruction.

█ Appellant also urges that an instruction as to count IV, which involved a contract issued by Security Investment Counselors, Inc., was followed by another which told the jury to consider the same as though repeated at length, with respect to the succeeding counts to and including count XX, substituting wherever the number IV appears the number of the particular count under consideration; that inasmuch as counts VII and XX involve contracts issued by J. H. Roth & Company, the failure to advise the jurors to transpose the name of such corporation in such two counts in effect told them that any criminal intent found as to Security Investment Counselors, Inc., would apply retroactively to the earlier transactions of the Roth Company. It is inconceivable that any jury would so reason. We must assume that that body was composed of intelligent beings, and any such would see at once, under the instructions given, that the counts involving the Roth Company contracts would require substitution not only of

the number of such count but of the name of the corporation that issued the stock there involved as well.

The court refused to give an instruction requested by defendant which told the jurors that in considering the credibility of a witness and in deciding what weight to give to his testimony it was their duty to consider, if it was a fact, that an indictment found by the grand jury against such witness had been dismissed by the district attorney prior to the latter's taking the stand on behalf of the prosecution, "all as tending to show a desire on the part of said witness to seek favor at the hands of the prosecution by aiding in the conviction of defendant". The court gave the jury the usual instruction as to the credibility of witnesses, which in our opinion sufficiently covered the matter without using particular phraseology desired by a party, which latter had the vice of applying to one witness only and draws the conclusion that is for the jury alone to make, as to what the effect of such dismissal might be on the witness.

The court refused to give an instruction requested by defendant advising the jury that a person, firm or corporation is considered solvent "so long as such person, firm or corporation can from their current assets" pay their debts as they become due and payable. An instruction was given by the court to the effect that if the jury believed that the corporation controlled by defendant and was held out to the complaining witness as being a company that was then solvent, etc., and that in truth and in fact said company was not then solvent, etc. Appellant urges that by reason of such use of the word "solvent" it was error to refuse the instruction above mentioned, inasmuch as the court did not in any other instruction define the meaning of "solvent" or "insolvent." In our opinion such words are in common use and as such were within the knowledge of the jurors, and we fail to see how appellant could have been prejudiced by such refusal.

Appellant was found guilty of violating the Corporate Securities Act under counts XXI, XXVI, XXVII and XXXIX. Count XXI as originally filed charged such violation in "that the said Jules H. Roth, on or about the 21st day of December, 1929, . . . did wilfully, unlawfully and feloniously offer for sale and sell to one Mrs. Mary

M. Campbell twenty-five (25) shares of the capital stock of Packard Motors, for value, without said defendant, or anyone, having applied for, or obtained, a permit so to do from the Corporation Commissioner of the State of California''. A demurrer to such counts was filed and overruled. At the beginning of the trial defendant demurred to the introduction of evidence on such counts and objected to the jurisdiction of the court to proceed thereunder, without avail. At the conclusion of the trial he objected to the case going to the jury on such counts and to amendments thereto being permitted. Such objections were all overruled and an amendment by interlineation was permitted by the court, which properly stated a violation of section 5 of the Corporate Securities Act, as it then existed, in acting as a broker without the required certificate authorizing defendant so to do. Counts XXVI, XXVII and XXXIX were identical with count XXI except for the difference in the names of the persons and the securities involved, and the same amendments were made as to such counts.

It appears that the transcript of the testimony taken at the preliminary hearing was introduced in evidence before the court to prove that the amendment in question would charge an offense there shown to have been committed by the defendant. This is not before us, but the record discloses that the court found that the showing warranted the allowance of the amendment. The record further discloses that the case before us was tried on the theory that the information charged the offense of acting as a broker without the proper certificate; and in our opinion the amendment, as the trial court found, did not prejudice appellant, as he knew at all times of the crime attempted to be charged, though defectively stated. We conclude that on the record before us there was no error in permitting such amendments.

For the same reason there was no substantial right of appellant on the merits prejudiced even though the demurrers and objections were erroneously overruled. Nor was there error in denying defendant's motion for arrest of the judgments.

Appellant contends that section 1008 of the Penal Code violates the provisions of the fourteenth amendment

of the federal Constitution, in that it deprives him of due process of law and his right to due notice. The record shows that appellant had notice from the information as originally filed of what was charged therein as violative of the Corporate Securities Act, and that the case was tried on that theory. Moreover, an amendment cannot be made under the section if it prejudices the substantial rights of a defendant; and inasmuch as he is furnished with a copy of the transcript of the proceedings at the preliminary hearing, he has notice of any charge that under the section may be placed against him by amendment of the information. The section itself preserves the substantial rights of the party to a trial on a charge of which he has had due notice, and that is all the Constitution requires.

It is urged also that the evidence shows that appellant was acting as an "investment counsellor" and not as a broker in the transactions mentioned, and that the Corporate Securities Act did not require an investment counsellor to obtain a certificate as a prerequisite to transacting such business, or refer in any way to installment purchase contracts, until it was amended in 1931, and that in consequence the evidence fails to show any violation of the act as it existed at the time of the transactions of which complaint is made.

Subdivision 2 of section 10 of the act as it then existed says: "The word 'broker' includes every person or company, other than an agent, who shall, in this state, engage either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, or otherwise dealing in any security not exempt under the provisions of this act issued by others . . . or of purchasing such securities with the purpose of reselling them, or offering them for sale to the public." (Stats. 1929, p. 1252.) "Sale" or "sell", under the act, then included "every disposition, or *attempt to dispose,* of a security or interest in a security for value", and included also "a contract of sale . . . an attempt to sell . . . a solicitation of sale . . . directly or by an agent". (Subd. 8, sec. 2.) The evidence clearly shows that appellant, through his companies and agents, was engaged in the solicitation of sales, making contracts for sale and, within the meaning of subdivision 2 of section 10 of the act as it then existed, was engaged in the business of

selling, offering for sale and negotiating for the sale of securities, and was a broker within the meaning of such act. He was exercising the functions of a broker, not of an investment counsel, which designation under the amendment of 1931 applies to one (other than a broker) who for compensation engages in the business of advising others as to the value of securities or the advisability of investing in or purchasing securities, or who issues analyses or reports concerning securities. (Stats. 1931, p. 938.) The amendment does not include the function of selling, and the broker who sells, as did appellant, necessarily advises; but his broker's certificate is all that is required of him. An examination of the amendment as to installment contracts (Stats. 1931, p. 946) shows that it does not bring such contracts, as a means of sale, within the purview of the act for the first time, but it in effect recognizes the existence of that method of selling securities, as already covered by the act, and requires the broker to submit the form used by him for the approval of the corporation commissioner and requires that it contain a clause specifying the time within which the purchase of the securities involved is to be made by the broker, as well as another showing the time within which delivery is to be made "after such deposit". In our opinion the act, prior to the amendment, covered the transactions here involved.

An expert accountant testified at length from summaries made by him from the books of defendant. It is very evident that the original books and accounts from which the summaries were made could not have been examined and the facts contained therein thus shown to the jury without great loss of time. We think this was properly done under subdivision 5 of section 1855, Code of Civil Procedure. The original records themselves were introduced in evidence, but both sides apparently used the summaries without reference to the originals. The summaries were received in evidence by the court "for convenience only and not to vary the terms of the original exhibits themselves". We see no possible way appellant could have been prejudiced.

There is no appeal from an order denying a defendant's motion in arrest of judgment (sec. 1237, Pen.

Code). If any error is committed by such order it would be reached on an appeal from the judgment.

Appeal from orders denying motions for arrest of judgment dismissed. Judgments and orders affirmed.

Stephens, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 26, 1934.