[Crim. No. 20766. Sept. 7, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED DAVID BRIGHAM, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon and Gary S. Goodpaster, Chief Assistant State Public Defenders, Richard Phillips, Laurance S. Smith and Gretchen T. Dumas, Deputy State Public Defenders, for Defendant and Appellant.

Michael D. McGlinn and Robert Seligson as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and Evelle J. Younger, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and Nelson P. Kempsky for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—This court must decide (1) whether a litigant has a right to oral argument on appeal, and (2) whether an instruction embodying former CALJIC No. 22 (rev.) may be properly given in a trial.

I

This appeal is from a conviction for two counts of robbery (Pen. Code, § 211) and one count of attempted robbery (Pen. Code, §§ 664, 211). Only one issue was raised in the Court of Appeal in appellant's brief. He claimed the court had erred in giving former CALJIC No. 22 (rev.) along with the standard instruction defining proof "beyond a reasonable doubt" (former CALJIC No. 2.90 (3d ed. 1970); see now CALJIC No. 2.90 (1979 rev.).)[1] The Court of Appeal upon the motion of the Attorney General granted summary affirmance of appellant's conviction. Appellant requested but was denied oral argument. This petition followed.

■ Does a Court of Appeal have the power to decide an appeal on its merits without affording counsel for appellant an opportunity for oral argument on the issues presented? The right to oral argument on appeal is recognized in the California Rules of Court, the Penal Code, the state Constitution, and prior decisions of this court.

Rule 22 of the California Rules of Court provides: "Unless otherwise ordered: (1) counsel for each party shall be allowed 30 minutes for oral argument; (2) not more than one counsel on a side may be heard except that different counsel for the appellant or the moving party may make opening and closing arguments; (3) each party and intervener who appeared separately in the court below may be heard by his own counsel; and (4) the appellant or the moving party shall have the right to open and close."[2]

The drafter of rule 22 has recognized the right to present oral argument. "The right of counsel to argue a cause orally before the

---

[1]For the text of these instructions, see footnotes 8 and 9, *post,* page 290.

[2]Rule 22 was adopted by the Judicial Council on March 30, 1943, and became effective on July 1, 1943.

Rule 30 of the rules on appeal provides that "[t]he rules governing appeals from the superior court in civil cases shall be applicable to appeals from the superior court in criminal cases except where express provision is made to the contrary, or where the application of a particular rule would be clearly impracticable or inappropriate." Rule 30 was new to the rules as effective on July 1, 1943.

reviewing court is implicit in Rule 22 and Rule 28(f).[3] Generally speaking, the right exists in any appeal or original proceeding which is considered on the merits and decided by a written opinion. . . ." (Witkin, *New California Rules on Appeal,* part two (1944) 17 So.Cal.L.Rev. 232, 243-244, fn. omitted.)[4]

The implicit right to oral argument on appeal found in the Rules of Court[5] is buttressed by the provisions of Penal Code section 1254. "Upon the argument of the appeal, if the offense is punishable with death, two counsel must be heard on each side, if they require it. In any other case the Court may, in its discretion, restrict the argument to one counsel on each side." (Pen. Code, § 1254.) Implicit in the wording of this statute is the fact that at least one counsel on each side must be allowed to orally argue his or her case in all noncapital appeals.

---

[3]Rule 28(f), applicable only to the Supreme Court, provides "[w]hen a hearing is granted, the cause shall be placed on the calendar for oral argument, unless oral argument is waived." This provision superseded in 1943 former rule XXX, section 5 which allowed the Supreme Court to decide certain kinds of causes without oral argument. When the rules were drafted in 1943, it was noted that "[d]oubt has been expressed as to the validity of [the old] rule in the light of the constitutional provision (art. VI, § 2) requiring 'the concurrence of four justices present at the argument.'" (*Annotations to Rules on Appeal* (1942) 17 State Bar J. 397, 415.) The fact that rule 28(f) replaced rule XXX, indicates an intent on the part of the drafters to ensure oral argument would be held in all appeals decided by the Supreme Court.

An earlier draft of rule 28(f) in 1943 allowed the Supreme Court to submit a cause for decision without oral argument "unless argument is requested by a party." However, this requirement of advance notice to the court of an intention to present argument was deleted in the final revision. Instead, oral argument was to be held unless waived. (See *Introduction: Tentative Final Draft, Rules on Appeal* (1942) 17 State Bar J. 360, 381.)

[4]The contemporaneous views of the drafters of the rules on appeal are entitled to great weight. (See *People* v. *Gaston* (1978) 20 Cal.3d 476, 482-483 [143 Cal.Rptr. 205, 573 P.2d 423].) The drafters of rule 22 did not intend that the phrase "[u]nless otherwise ordered" at the beginning of the rule would empower an appellate court to refuse to hear oral argument. Rather, it was meant to give appellate courts discretion to limit the amount of time to be allotted for argument.

In the report on the California Courts of Appeal by the National Center for State Courts, the following language can be found. "No court rules . . . expressly authorize oral argument before an appellate court panel. Yet, the right is generally recognized in California. . . . The 'right' to oral argument may be based in part on California Rule of Court 22. . . ." (Nat. Center for State Cts., The Cal. Courts of Appeal (1974) pp. 125-126.)

[5]See also rule 22.5(a), effective September 1, 1978, which provides in pertinent part: "A cause pending in a Court of Appeal is submitted when the court has heard oral argument, or has approved a waiver of oral argument, and the time has passed for filing all briefs and papers, including any supplementary brief permitted by this court."

This new rule is an acknowledgment of the fact that oral argument is a matter of right on appeal.

In *People* v. *Medina* (1972) 6 Cal.3d 484, 489 [99 Cal.Rptr. 630, 492 P.2d 686], this court explicitly stated that oral argument on appeal was a "right." "Important incidents of the right to appeal from a superior court's judgment are the right to present oral argument in the appellate court (see Pen. Code, § 1254; Cal. Rules of Court, rules 22, 30). . . ." (See also, *People* v. *Getty* (1975) 50 Cal.App.3d 101, fn. 3, 106 at p. 107 [123 Cal.Rptr. 704]; *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190, 230-231 [124 Cal.Rptr. 427].)

Forty years ago, a rule of court which authorized summary affirmances of judgments in *civil* cases was repealed. Former rule V, section 3, adopted in 1932 and repealed in 1939, read in pertinent part: "At any time after the filing of the opening brief of an appellant in a civil action, the respondent may, upon due notice, move for a dismissal of the appeal or an affirmance of the judgment or order on the ground that the appeal was taken for delay only or that the questions on which the decision of the cause depends are so unsubstantial as not to need further argument."[6]

"[A]dopted under the supposition it would facilitate the weeding-out . . . of appeals presenting no substantial question, and thereby alleviate the crowded condition of the appellate court calendars . . . , on the whole, the conditions brought about by the rule were unsatisfactory and the burden on the courts was increased rather than lightened, with no practical benefit to the litigants." (Whitworth, *Reasons for Repeal of Appellate Court Dismiss-or-Affirm Motion Explained* (1939) 14 State Bar J. 334, 335.) Appellate justices found themselves having to review briefs twice, once on motion for summary affirmance and again at the time of oral argument. When section 3 of former rule V was repealed, it was noted that "the summary affirmance of judgments is likely at an end. . . ." (*Id.,* at p. 336.)

The Constitution of the State of California recognizes a right to oral argument on appeal. Article VI, section 3 provides that: "[c]oncurrence of 2 judges present at the argument is necessary for a judgment" by the Court of Appeal. Adopted in November 1966, this provision evolved from former article VI, section 4a which read, "the concurrence of two justices shall be necessary to pronounce a judgment." The phrase "present at the argument" was added in 1966 to ensure that article VI, section 3 was "parallel" with article VI, section 2, which governed the

---

[6]See Rules for Supreme Court and District Courts of Appeal (1931) 213 Cal. xxxv, xliii; see also Eighth Biennial Report, Judicial Council of California to the Governor and the Legislature (1938-1940), page 34.

Supreme Court.[7] (Cal. Const. Revision Com., Proposed Revision of arts. III, IV, V, VI, VII, VIII, and XXIV of the Cal. Constitution (Feb. 1966) at p. 86.)

In *Metropolitan Water Dist.* v. *Adams* (1942) 19 Cal.2d 463 [122 P.2d 257], this court recognized that article VI, section 2 had to be complied with if a valid appellate judgment on the merits was to be handed down by the Supreme Court. "[T]he right to oral argument in matters on the calendar in open sessions of the court has always been accorded and the necessity for the concurrence of four members of the court who were present at the argument in pronouncing judgment in the cause has always been scrupulously adhered to and enforced." (*Id.*, at p. 468.) However, a vote to rehear a case was *not* to be construed as a judgment on the merits, so article VI, section 2 was not applicable.

This court implicitly recognized the right to oral argument in *Philbrook* v. *Newman* (1905) 148 Cal. 172 [82 P. 772]. In that case, the court held that appellant's failure to appear for argument constituted a waiver. Due to the waiver of oral argument, the court could properly decide the issues presented on the briefs alone. (*Id.*, at pp. 178-179.)

Again, implicit recognition of the right to present oral argument was made in *Luco* v. *De Toro* (1891) 88 Cal. 26, 27 [25 P. 983]. This court had to set aside its own decision in the case because the decision was concurred in by a fourth justice who was not present at argument. Since counsel for appellant had not stipulated to that justice's participation, he had a right to invoke the requirement of article VI, section 2 that the justice be present at oral argument.

The case law, the constitutional provisions, the applicable rules of court and the Penal Code sections all point to one result, the Court of Appeal cannot summarily affirm a criminal conviction without first holding oral argument.

Respondent's cases are inapposite. *Brown* v. *Gow* (1932) 126 Cal.App. 113 [14 P.2d 322] involved the now repealed section 3 of former rule V as it applied to a *civil* case. At the time, the state Constitution did not

---

[7]Article VI, section 2 reads in part: "Concurrence of 4 judges present at the argument is necessary for a judgment" by the Supreme Court. This language was adopted in November 1966 when article VI, section 2 as formerly worded was repealed.

Since article VI, section 3 was specifically reworded to make it parallel with article VI, section 2, all the cases which interpret the phrase "present at the argument" in article VI, section 2 are now equally applicable to the same sections in article VI, section 3.

require the presence of the justices at oral argument before a judgment could be rendered by the Courts of Appeal. Similarly, in *People* v. *Sumner* (1968) 262 Cal.App.2d 409 [69 Cal.Rptr. 15], the court dismissed appellant's appeal after relieving appointed counsel under the procedures outlined in *Anders* v. *California* (1967) 386 U.S. 738, 744 [18 L.Ed.2d 493, 498, 87 S.Ct. 1396] and *People* v. *Feggans* (1967) 67 Cal.2d 444 [62 Cal.Rptr. 419, 432 P.2d 21]. (*People* v. *Sumner, supra,* 262 Cal.App.2d at p. 410.) Then, when appellant failed to file any brief, he was notified by the court that his appeal would be dismissed unless a brief were received within 30 days. He failed to respond and the court reviewed appellant's petition for a writ of error *coram nobis,* found his contentions wholly frivolous, and only then dismissed the appeal. (*Id.,* at pp. 415-416.) The court drew the line "between a frivolous appeal and one which simply has no merit." (*Id.,* at p. 415.) It went on to hold that courts should not dismiss an appeal as frivolous except "in all but the clearest of cases." This rare occurrence would be present if appellant and his counsel were unable to find any arguable issue *and* the Court of Appeal agreed after its own careful review.

In the present case, the Court of Appeal found appellant's claim "theoretically arguable," although "as a practical matter hopeless." *Anders* and *Feggans* require appellant's counsel to argue any issue that is arguable. Similarly, the appellate court had an obligation to hear the arguable argued. Appellant's counsel never sought to withdraw from the case for lack of an arguable issue as was the situation in *Sumner.*

*People* v. *Browning* (1978) 79 Cal.App.3d 320 [145 Cal.Rptr. 45] is cited by respondent as support for the procedure employed by the Court of Appeal. In *Browning,* the Court of Appeal did grant a motion for reversal, but *only* after oral argument was held on the motion at which the merits of the appeal and the motion were debated. (79 Cal.App.3d at p. 322.) Obviously, *Browning* is not support for a procedure to bypass oral argument since oral argument was held in that case.

Clearly, the Court of Appeal acted outside its authority when it summarily affirmed appellant's conviction without holding oral argument.

## II

As a matter of judicial economy, the merits of appellant's appeal will be resolved in this proceeding. Appellant contends that the joining of

former CALJIC No. 22 (rev.)[8] with CALJIC No. 2.90[9] was prejudicial and requires a reversal of his conviction.[10]

CALJIC No. 2.90 is the only instruction defining reasonable doubt in the CALJIC jury instructions. It was borrowed from Penal Code section 1096.[11] Although its language is somewhat archaic, this court has repeatedly warned that "most of the instructions of courts on the old subject of reasonable doubt turn out to be erroneous when they . . . step outside of well-established bounds." (*People* v. *Lenon* (1889) 79 Cal. 625, 629 [21 P. 967]; see also *People* v. *Kynette* (1940) 15 Cal.2d 731, 757 [104 P.2d 794]; *People* v. *Paulsell* (1896) 115 Cal. 6, 10 [46 P. 734].) In *People* v. *Garcia* (1975) 54 Cal.App.3d 61, 63-65 [126 Cal.Rptr. 275], a long list of cases in which the courts have disapproved other instructions on reasonable doubt has been compiled. This close scrutiny by the courts of deviations from the norm is eloquent testimony to the fact that the reasonable doubt instruction more than any other is central in preventing the conviction of the innocent.

Former CALJIC No. 22 (rev.) has some serious flaws. It defines "moral certainty" as "that degree of proof which produces conviction in an unprejudiced mind." The phrase which is suspect is "that degree of proof which produces conviction." CALJIC No. 2.90 speaks of an "abiding conviction;" former CALJIC No. 22 (rev.) speaks only of "conviction." The lasting, permanent nature of the conviction connoted by "abiding" is missing and the juror is not informed as to how strongly and how deeply

---

[8]Former CALJIC No. 22 (rev.), given by the court with the exception of the word "only," reads as follows. "The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind."

[9]CALJIC No. 2.90 (1979 rev.) provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

[10]In his supplemental brief, appellant has requested this court to decide his appeal on the merits.

[11]The author of the concurring opinion is correct when he criticizes the standard definition of reasonable doubt contained in CALJIC No. 2.90. The Legislature should be encouraged to clarify this important area of the law.

his conviction must be held. Thus, former CALJIC No. 22 (rev.) may allow a juror to conclude that he or she could return a guilty verdict based on a strong and convincing belief which is something short of having been "reasonably persuaded to a near certainty." (*People* v. *Hall* (1964) 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].)[12]

Since Penal Code section 1096 outlines the definition of reasonable doubt as contained in CALJIC No. 2.90, jurors should not be confused by having the weaker language of former CALJIC No. 22 (rev.) read with the stronger language of CALJIC No. 2.90. As a Court of Appeal has noted, former CALJIC No. 22 (rev.) "might better [be] omitted since [it does] not add to the correctness of the definition of [reasonable doubt] and serve[s] but to create a controversy on appeal." (*People* v. *Castro* (1945) 68 Cal.App.2d 491, 500 [157 P.2d 25].)

This instruction was removed from the list of CALJIC jury instructions (CALJIC (3d ed. 1970)) because of some well deserved criticism. It was originally drawn from the language of a now repudiated and repealed section of the Code of Civil Procedure, which had been criticized as early as 1916 in *People* v. *Miller* (1916) 171 Cal. 649, 654 [154 P. 468]. In that case, this court objected to the language of section 1826 as "rather carelessly drawn . . . ."[13] In 1965, section 1826 was repealed because it contained an "inaccurate description of the normal burden of proof" in civil cases. (Cal. Law Revision Com. Rep. (1964) p. 1035.)

The California Law Revision Commission implicitly recognized that Code of Civil Procedure section 1826, *by itself,* was not an adequate

[12]"We are first told that in order for reasonable doubt to be absent one must feel 'an abiding conviction,' *i.e.,* a belief with staying power. Even absolute positivism, if it wanes after some undetermined and undeterminable time is insufficient. Hence, not just any kind of 'conviction' will dispel . . . reasonable doubt, it must be the 'abiding' kind only. But then we're told all that really is necessary is 'moral certainty.' And what is 'moral certainty'? Why it's plain ol' unvarnished, unmodified (*un*abiding) 'conviction' ('in an unprejudiced mind,' of course)." (Sinetar, *A Belated Look at CALJIC* (1968) 43 State Bar J. 546, 555.)

[13]Former Code of Civil Procedure section 1826 provided: "The law does not require demonstration; that is, such a degree of proof as, excluding possibility of error, produces absolute certainty; because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind."
Former Code of Civil Procedure section 1835 defined *"satisfactory evidence"* as that "which ordinarily produces moral certainty or conviction in an unprejudiced mind." It is difficult to believe that the same language is adequate to capture the meaning of *both* "satisfactory evidence" and also proof "beyond a reasonable doubt." Certainly, "satisfactory evidence" is not synonymous with proof "beyond a reasonable doubt."

definition of reasonable doubt and that it served no useful purpose since the court had to make clear to the jury that "it means the same thing as reasonable doubt."

■ Since former Code of Civil Procedure section 1826 has been repealed, and former CALJIC No. 22 (rev.) has been removed from the CALJIC list of jury instructions, this instruction should no longer be given. It is the last vestigial remains of an inartfully drawn statute which has never been given a consistent interpretation by this court.[14] Under the inherent supervisory powers of this court over the procedures of trial courts, the giving of any instruction based on former CALJIC No. 22 (rev.) is disapproved.[15]

Appellant contends that prejudicial error was committed when the trial court instructed the jury in the language of former CALJIC No. 22 (rev.). However, a close review of the record reveals that it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Appellant was convicted on two counts of robbery and one count of attempted robbery. All three counts involved the same store with one or more employees providing positive eyewitness identification of appellant as the robber. Under these facts, it is clear that the error in giving former CALJIC No. 22 (rev.) was harmless.

The judgment is affirmed.

Tobriner, J., Mosk, J., and Manuel, J., concurred.

Richardson, J., concurred in the judgment.

**MOSK, J.**—Although I fully agree with the majority's criticism and disapproval of former CALJIC No. 22 (rev.), I believe it is time we also acknowledge the equally glaring deficiencies of the definition of "reason-

---

[14](See, e.g., *People* v. *Eggers* (1947) 30 Cal.2d 676, 688 [185 P.2d 1]; *People* v. *Boothe* (1977) 65 Cal.App.3d 685, 690 [135 Cal.Rptr. 570]; *People* v. *Fusaro* (1971) 18 Cal.App.3d 877, 893 [96 Cal.Rptr. 368]; *People* v. *Wade* (1971) 15 Cal.App.3d 16, 25-26 [92 Cal.Rptr. 750]; *People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 698-699 [83 Cal.Rptr. 764]; *People* v. *Romero* (1969) 272 Cal.App.2d 39, 50-51 [77 Cal.Rptr. 175]; and *People* v. *Miller, supra,* 171 Cal. 469.)

[15]That part of the holding of this case which disapproves the giving of former CALJIC No. 22 (rev.) to the jury should be applied retroactively only to cases whose judgments have not become final as of the date on which this opinion becomes final.

able doubt" given to the jurors as part of CALJIC No. 2.90. The need to do so is obviously more pressing. Even before our decision herein, former CALJIC No. 22 (rev.) was a withdrawn instruction based on a repealed statute; by contrast, CALJIC No. 2.90 is currently given in every criminal trial held in this state (see Pen. Code, § 1096a), and is the sole instruction the jury hears on a fundamental issue of federal constitutional dimension—the requirement of proof beyond a reasonable doubt. (*People* v. *Vann* (1974) 12 Cal.3d 220, 225-228 [115 Cal.Rptr. 352, 524 P.2d 824].) It is therefore essential that the wording of the instruction be as clear and meaningful to the jurors as is humanly possible: to this difficult problem "the best solution that can be made is the only solution with which the legal profession should be content." (McBaine, *Burden of Proof: Degrees of Belief* (1944) 32 Cal.L.Rev. 242, 258 (hereinafter McBaine).) As it presently reads, however, CALJIC No. 2.90 falls woefully short of that ideal.

With the majority I also recognize that CALJIC No. 2.90 is a verbatim copy of a statute—Penal Code section 1096—and hence that the remedy is not judicial but legislative. Yet it is particularly appropriate for this court to call the problem to the attention of the Legislature, and even propose an answer. As will appear, in enacting the present version of the statute in 1927 the Legislature simply codified a solution this court had been urging for some years. If we are now of the opinion—as I am—that our earlier solution is no longer adequate for the purpose, it is our duty to explain why and to urge the Legislature to reconsider its codification accordingly.

I

The history of the matter may be briefly told. For the first three-quarters of a century after statehood California statutory law declared the basic principle that a criminal defendant is presumed innocent until proved guilty beyond a reasonable doubt, but contained no definition whatever of the phrase "reasonable doubt." Thus the early statutes on the subject recited only that "A defendant in a criminal action is presumed to be innocent until the contrary be proved, and in case of a reasonable doubt whether his guilt be satisfactorily shown, he is entitled to be acquitted." (Stats. 1850, ch. 119, § 395, p. 304; Stats. 1851, ch. 29, § 365, p. 252.) In 1872 this provision was reenacted in virtually identical language as section 1096 of the Penal Code, and it remained unchanged for 55 more years.

During the same period, however, the trial judges of this state often attempted the task of formulating their own definitions of reasonable doubt. A variety of such formulations were tried, but with mixed success. In a number of cases the definition, although intended to help the jury understand the principle of proof beyond a reasonable doubt, had the unintended effect of weakening or nullifying the principle itself, and hence was prejudicially erroneous. Reversing the ensuing convictions, this court chose not to prohibit or even to discourage trial judges from enlarging upon the statutory principle; rather, the court urged them to instruct in terms of a particular definition of reasonable doubt that had received widespread judicial approval, i.e., the definition proposed by Chief Justice Shaw of Massachusetts in the case of *Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295, 320. (See, e.g., *People* v. *Strong* (1866) 30 Cal. 150, 155; *People* v. *Kernaghan* (1887) 72 Cal. 609, 610 [14 P. 566]; *People* v. *Chun Heong* (1890) 86 Cal. 329, 332 [24 P. 1021]; *People* v. *Paulsell* (1896) 115 Cal. 6, 10-12 [46 P. 734].)

In 1927 the Commission for the Reform of Criminal Procedure reviewed this history and decided the matter deserved legislative attention. Noting the numerous reversals that had resulted from erroneous instructions defining reasonable doubt, the commission proposed that the Legislature adopt a statutory definition of the phrase that would assertedly "remove all doubts and uncertainties on this subject, and provide a clear statement of the law which can be given in every case and to which nothing need be added. . . . The adoption of this statute will add much to the certainty of the operation of criminal law." (Com. for Reform of Crim. Proc., Rep. to Leg. (1927) p. 20.)

Unfortunately the commission's method was not equal to its motive; it sought both certainty and clarity in the definition of reasonable doubt, but achieved the former only at the expense of the latter. The commission failed to recommend that the Legislature follow the course it would take only two years later (Stats. 1929, chs. 875 & 876, p. 1939) when it enacted statutory instructions on expert testimony (Pen. Code, § 1127b) and evidence of flight by the defendant (*id.,* § 1127c): those instructions were written in contemporary language, and they continue to make sense to. the average juror today. Instead, the commission recommended that the Legislature incorporate verbatim into section 1096 the definition of reasonable doubt propounded 77 years earlier by Chief Justice Shaw in *Webster,* and declare in new section 1096a that "no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." The Legislature complied to the letter with both

recommendations, and its ensuing amendments (Stats. 1927, ch. 604, p. 1039) have remained the law ever since.

## II

The problem is that the 1850 language of Chief Justice Shaw was already obsolete in 1927, and it is hopelessly superannuated in 1979. To realize this it is only necessary to listen calmly and dispassionately to the definition of reasonable doubt recited in section 1096 and CALJIC No. 2.90 and try to imagine how much of it the ordinary juror understands.

## A

The definition begins by telling the juror what reasonable doubt is not: "It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt." On a hasty reading the sentence seems intelligible, but confusion lurks beneath its surface.

The most serious pitfall is the phrase "moral evidence." Upon hearing this a contemporary juror might well ask himself, "What in the world is *moral* evidence? Is it different from *direct* evidence and *circumstantial* evidence? If so, how? Different in quality? In quantity? Are there three kinds of evidence: Moral, direct, circumstantial? What kind is 'moral'? The dictionary synonyms are 'pure, righteous, upright.' The antonyms are 'immoral, vicious, sinful, depraved.' It simply makes no sense to speak of 'pure evidence' or 'righteous evidence' or 'upright evidence' or 'non-sinful evidence.' Is the phrase just an ancient typographical error with the intended term being 'mortal evidence,' meaning evidence that man (transient and fallible) provides?" (Fns. omitted.) (Sinetar, *A Belated Look at CALJIC* (1968) 43 State Bar J. 546, 553-554 (hereinafter Sinetar).) Other questions might also arise; but as the writer correctly concludes (*id.,* at p. 554), "A juror listening to the phrase 'moral evidence' is certain to be confused."

He is confused, of course, because the phrase "moral evidence" has no currency in this last quarter of the 20th century. Indeed, while its meaning may have been known to legal scholars in 1850, it does not appear to have been understood by laypersons even at that time. We may so infer from the fact that in the same instructions in which Chief Justice Shaw propounded his definition of reasonable doubt, he also found it necessary to explain to the jurors at great length what he meant by

"moral evidence."[1] According to this explanation, "moral evidence" was to be distinguished from "physical evidence"; the latter served to prove external facts such as cause of death or identity of the criminal, and could be "so decisive as to. leave no doubt; as where human footprints are found on the snow, . . . the conclusion is certain, that a person has passed there; because we know, by experience, that that is the mode in which such footprints are made." (59 Mass. at p. 314.) By contrast, "moral evidence" was said to be evidence of internal facts such as a person's intent or motive, as implied by his conduct. The latter evidence could not furnish absolute proof, for "this intent is a secret of the heart, which can only be directly known to the searcher of all hearts. . . ." (*Id.*, at p. 316.) Yet from his acts the person's state of mind could often be "safely inferred" by the jurors in light of their knowledge of human nature. (*Ibid.*)

The contemporary juror, however, knows none of all this. The phrase "moral evidence" has passed out of the common idiom,[2] and neither the Penal Code nor CALJIC requires our courts to instruct in terms of the foregoing explanation by Chief Justice Shaw. Nor would it be appropriate to do so. If this elaborate distinction between "moral" and "physical" evidence was ever part of the law of California, it is no longer. Under the code, "evidence" includes all "testimony, writings, material objects, or other things presented to the senses" that are offered as proof. (Evid. Code, § 140.) The "requisite degree of belief . . . in the mind of the trier of fact" (*id.*, § 115) does not vary according to the kind of evidence offered, but according to the issues sought to be proved. When as here the issue is the guilt of a defendant charged with crime, Penal Code section 1096 requires that fact to be established beyond a reasonable doubt whether the evidence offered to prove it be "moral" or "physical."

The instruction is misleading in another respect. By singling out "moral evidence" as the particular species of proof "open to some possible or imaginary doubt," it implies that "physical evidence" is somehow *not* susceptible to uncertainty. But it is not true that every piece of demonstrative evidence conclusively proves the fact for which it is introduced; often it is simply a clue pointing in that direction, ambiguous in itself but persuasive when viewed in the totality of the People's case.

---

[1]The explanation (59 Mass. at pp. 314-316) is approximately 10 times longer than the entire definition of reasonable doubt quoted in section 1096.

[2]It is not defined, for instance, in the third edition of Webster's New International Dictionary, a standard American reference work.

Not even scientific or experimental evidence always rises to the level of certainty. Such evidence comes today in many forms—from fingerprints to "voiceprints," from alcohol and blood tests to "lie detectors" and "truth serum," from medical X-rays to "radar speedmeters"—and to each of these forms corresponds a different degree of reliability. A principal reason for our caution in admitting evidence of new tests and techniques is that "Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials." (*People* v. *Kelly* (1976) 17 Cal.3d 24, 31 [130 Cal.Rptr. 144, 549 P.2d 1240].) We should not compound that risk by an instruction suggesting to the jurors that the inferences they draw from such evidence will necessarily be free of doubt. If that was Chief Justice Shaw's intent it can only be ascribed to an ingenuous belief prevalent in the mid-19th century in the potential of science for solving all human dilemmas.

Finally, even if the archaic phrase "moral evidence" were omitted, the first sentence of the definition of reasonable doubt would remain essentially ambiguous. Its message to the jury is that reasonable doubt is not a "possible" doubt. Whether this statement helps or hinders, however, depends entirely on how each juror understands the key word "possible." Unfortunately the word has many meanings, and the instruction does not define it. If the juror were to take it in the sense of "potential"—as opposed to "actual"— the statement would perhaps be intelligible. But that is not the primary meaning of "possible"; much more commonly it simply denotes that which can be or can become—as opposed to "impossible." Yet if it is so understood, the instruction again mystifies the juror: it begins by informing him he must vote to acquit if he has a reasonable doubt, then it tells him that such a doubt is not possible. "Thus, not only is it not helpful to distinguish '*possible* doubt' from '*reasonable* doubt,' it is downright confusing." (Sinetar, *supra,* at p. 554.)

B

The second sentence of the definition of reasonable doubt in section 1096 and CALJIC No. 2.90 is still more obscure. It attempts to define the concept affirmatively, i.e., "It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they can not say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The creaky structure of this sentence will not support the weight of close analysis.

To begin with, it makes no sense to instruct that reasonable doubt is a "state of the case." Again a juror might well ask himself, "How can any kind of a doubt, even a *reasonable* doubt, be a quality a lawsuit has, be an attribute of a 'case'? Surely doubts are states of *mind*." (Sinetar, *supra,* at p. 554.) This court rejected an identical complaint 75 years ago, but wholly without analysis.[3] The objection remains unanswered, and the continued use of this loose language causes needless confusion.

The definition next directs the jurors to make what it calls "the entire comparison and consideration of all the evidence" in order to determine if they have a reasonable doubt. This stilted phrase manages to be at once redundant and incomplete. It is redundant because in the present context there is essentially no difference between "comparison" and "consideration," or between "entire" and "all." The repetition distracts, but does not clarify. On the other hand the phrase contains several significant omissions. It has been criticized for failing to instruct the jurors that their review of the evidence must be "fair and impartial." (*Claussen* v. *State* (1913) 21 Wyo. 505 [133 P. 1055, 1056].) Perhaps more importantly, by limiting the jury's review to "the evidence" it implies that a doubt *not* arising from that source cannot qualify as reasonable. Yet there are at least three other possible and legitimate sources of juror doubt in every trial.

First, a reasonable doubt can arise not only from the presence of evidence in the defendant's case—e.g., persuasive alibi testimony—but also from the absence of evidence from the prosecution's case—i.e., some link in the chain of guilt that the jury deems to be missing from the People's presentation. Second, by instructing on the presumption of innocence as required by section 1096, the court in effect—and properly—directs the jurors to doubt the guilt of the accused even before they begin their consideration of the evidence. "Suppose that initial doubt persists, despite the evidence. Will it arise *out* of the evidence? Must the juror say guilty, because his still present doubt is a mere continuation of the doubt with which he began?" (Trickett, *Preponderance of Evidence, and Reasonable Doubt* (1906) 10 The Forum (Dick. L.

---

[3]The court's entire discussion of the point was the curt remark that "The term 'case' used in the instruction was used by Chief Justice Shaw in his definition of reasonable doubt in the case of *Commonwealth* v. *Webster,* 59 Mass. (5 Cush.) 295, 320, and this instruction has been so often approved by this court that defendant's objection does not seem to call for further comment." (*People* v. *Lewandowski* (1904) 143 Cal. 574, 580 [77 P. 467].) In that case reliance on stare decisis seems to have been improper, however, as it does not appear that the court addressed the precise objection in any of its prior decisions approving the instruction.

School) 75, 82 (hereinafter Trickett).) Third, each juror brings to the deliberations his personal store of experience, knowledge, and judgment; these are the tools by which he tests "the credibility, the probability of the testimony of witnesses, or of the inferences to be drawn from circumstances. The doubt lingering in his mind, after the evidence has been concluded, may be produced by the application of these subjective criteria to it. Is such a doubt illegitimate?" (*Ibid.*) Surely not, even though its source is his individual perception of the evidence put before him.

The principal defect in the second sentence of the definition, however, is even more serious: the jurors are told they have a reasonable doubt if they do not feel "an abiding conviction, to a moral certainty, of the truth of the charge." The quoted formula, as will appear, raises far more questions than it answers.

First, what is an "abiding" conviction? Again the word has an antique ring: while it may have been current in 1850, it has long since fallen into disuse and is no longer part of our daily speech. As with the phrase "moral evidence," the jurors are left without guidance from the trial court as to its intended meaning. The appellate courts have occasionally suggested definitions, but their efforts show only that the word was a poor choice in the first place.

Thus in *People* v. *Castro* (1945) 68 Cal.App.2d 491, 500 [157 P.2d 25], the Court of Appeal stated that " 'Abiding conviction' is the equivalent of 'settled conviction,' " citing an early New Jersey case.[4] In the case at bar, the majority refer to the "lasting, permanent nature of the conviction connoted by 'abiding' " (*ante*, p. 290). Yet this emphasis on the *duration* of the jury's belief is both confusing and misdirected. It is confusing because it leads the juror to ask further embarrassing questions: "What conviction? It is an abiding conviction. But, what is that? One that has abode, for a considerable time, or one that is going to abide? How long before rendering the verdict must the conviction expressed by it have been formed? A week, a day, an hour, five minutes? If the abidingness is future, by what faculty does the juror know that it is going to abide? By what quality of the conviction does he recognize its longevity? By its strength? By its defiance of past argument in the jury-room? Who knows?" (Trickett, *supra*, at p. 85.)

---

[4]The court added, "It is used in the sense of 'convince.' " (*Ibid.*) A "convincing conviction," however, is an obvious tautology that explains nothing.

The emphasis is misdirected because the duration of a juror's belief in guilt is essentially irrelevant. In order to convict, he must believe the defendant guilty beyond a reasonable doubt at the time the verdict is reached, declared in open court, verified by polling the jury if that step is requested, and recorded. But there is no requirement that his belief persist for any period of time thereafter. Following the juror's discharge, for example, further reflection or subsequent events may raise a reasonable doubt in his mind or even persuade him of the defendant's innocence. In such circumstances it cannot be said he had an "abiding" conviction of guilt in the temporal sense defined above, even when the verdict was rendered. Nevertheless the verdict stands: in its concern for the finality of judgments the law does not permit a juror to impeach his verdict on this ground, nor will such an occurrence support a motion for new trial or reversal on appeal.

It is true the majority imply an additional meaning of "abiding" when they assert (*ante,* p. 290) that if the word is omitted from the instruction the juror is not told "how strongly and how deeply" he must believe in guilt in order to convict. I agree that the *intensity* of the juror's belief in guilt—as opposed to its duration—is relevant; but the word "abiding" is singularly inapt to convey that thought. To the extent it has any current meaning at all, the word suggests persistence or duration: modern dictionaries define it exclusively in those terms. (See, e.g., Webster's New Internat. Dict. (3d ed. 1961) p. 3.) We cannot expect juries to guess that in giving CALJIC No. 2.90 the trial court is using this obsolete adjective in a substantially different sense.[5]

At last the juror hears the most crucial phrase of the instruction: the court tells him he has a reasonable doubt if he does not believe in the truth of the charge "to a moral certainty." The expression, regrettably, is no more intelligible to the average venireman than any of the preceding elements of the definition: if he is waiting for enlightenment, he will not find it at the end of the tunnel. Indeed, this one aspect of Chief Justice Shaw's charge has drawn most of the scholarly and judicial criticism over the years, and in my view it is well deserved.

[5]Even the instruction's use of the word "conviction" in the phrase "abiding conviction" is unnecessarily confusing. In a criminal trial, of course, "conviction" has another and distinct meaning—the formal finding and adjudication of the defendant's guilt. By using the same word in a wholly different sense—i.e., the individual juror's belief in that guilt—the instruction produces the absurdity of predicating "the [defendant's] conviction" on "the [jury's] conviction."

At the outset it is fair to ask what Chief Justice Shaw himself intended by the phrase "moral certainty." From the tone of the opinion in *Webster* it appears he meant that a person is "morally certain" when he is as certain as he can be of a fact proved by "moral evidence."[6] But as explained above, today's jurors have no idea what "moral evidence" is, and it would be improper to revive the distinction to which it originally referred. Furthermore, the explanation is essentially uninformative: because "moral evidence" is proof that by definition is incapable of resulting in certainty, a person is said to be "morally certain" in this sense when he is as certain as he can be of a fact of which he cannot be certain.

Perhaps realizing this deficiency, Chief Justice Shaw attempted a specific definition of "moral certainty" in his instructions to the jury: it is "a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it." (59 Mass. at p. 320.) Instructions embodying this definition were upheld in early decisions without analysis, often merely because it was "a quotation from the famous charge of Chief Justice Shaw in the Webster case, and has been uniformly if not universally approved." (*People v. Lew Fook* (1904) *supra,* 141 Cal. 548, 549.) Later cases followed suit (e.g., *People v. Eggers* (1947) 30 Cal.2d 676, 688 [185 P.2d 1]; *People v. Herrera* (1962) 209 Cal.App.2d 748, 753 [26 Cal.Rptr. 409]), and the instruction was sanctified in the first edition of CALJIC as No. 22 of that collection.

During the same period, however, occasional critical voices were heard. Thus in approving a refusal to give an instruction containing Chief Justice Shaw's definition of "moral certainty," the Court of Appeal candidly observed: "It might be quite interesting and illuminating to a philologist, but it is believed that it would be of no benefit to the average juror. Indeed, the instruction as a whole seems to us somewhat uncertain and obscure, and while it would probably have done no harm, if it had been given, it is fair to say that it would have done no good." (*People v. McDonnell* (1917) 32 Cal.App. 694, 702 [163 P. 1046].) In an article quoted with obvious approval by Wigmore (9 Wigmore on Evidence (3d ed. 1940) pp. 322-323 (hereinafter Wigmore)), the author briskly deflated the high-sounding words of the definition and showed it actually

---

[6]This court has approved an instruction similarly stating that " 'Moral certainty' is that degree of proof which the law requires of moral evidence." (*People v. Lew Fook* (1904) 141 Cal. 548 [75 P. 188].)

contained nothing to help jurors understand the phrase "moral certainty."[7]

By 1967 instruction No. 22 had been withdrawn from CALJIC. It was replaced by instruction No. 22 (rev.) which defined "moral certainty" as "that degree of proof which produces conviction in an unprejudiced mind." The wording was taken verbatim from Code of Civil Procedure section 1826, which had so declared since its original codification in 1872. But No. 22 (rev.) has fared no better than its predecessor: as the majority opinion herein emphasizes (*ante,* pp. 291, 292), section 1826 came under attack and was repealed effective 1967, and No. 22 (rev.) was thereafter withdrawn from CALJIC. As the *coup de grâce,* the majority now disapprove No. 22 (rev.) because its "serious flaws" (*ante,* p. 290) have the potential of confusing the jurors as to the meaning of the standard of proof beyond a reasonable doubt.

The irony in all this, of course, is that the purpose of both these hapless instructions was not to undermine the requirement of proof beyond a reasonable doubt, but simply to define "moral certainty"—a thankless task made necessary only because in 1927 the Legislature wrote the obsolete language of Chief Justice Shaw into our code. And because no other statute or instruction attempts the task, the effect of withdrawing CALJIC Nos. 22 and 22 (rev.) is plain: the law now instructs the jurors that reasonable doubt is a lack of "moral certainty," but refuses to tell them what "moral certainty" is! Yet if legislators and judges cannot satisfactorily define the phrase, what right do they and we have to demand more of the laymen and women who sit on our juries?

---

[7] "In order to convict, we are further told, the evidence must produce a moral certainty of the guilt.' But this certainty has some very peculiar powers. It 'convinces, and it directs the understanding,' it 'satisfies the reason and judgment.' Certainty is the state of being convinced, but, in Shaw's philosophy, it is the cause of, and therefore different from, the conviction. A moment ago, there was 'an abiding conviction *to* a moral certainty' but now it is a certainty generating a conviction! This certainty, (which is not a state, but an actor, a cause) has seemingly, three subjects on which to operate. There is an understanding; there are a reason and a judgment! Or are these three names only for one thing? But, that cannot be, for the operations are different. The certainty convinces and directs the understanding. It does no such thing for the reason or the judgment. Its function is, respecting these, humbler shall we say, or more exalted? It 'satisfies' the reason and judgment! A certainty satisfies! The certainty that one has fallen heir to a million dollars 'satisfies' but it does not satisfy the reason; only the cupidity, the desire for happiness; The certainty that X the defendant killed Y, satisfies the reason! What is this strange elusive thing called satisfaction of the reason? And what singular thing is reason, that it should be satisfied by a certainty that the defendant has committed an atrocious crime? Perhaps what is satisfied is the desire to find out who committed it, that is, the official curiosity of the jurors for which 'reason and judgment' are odd names." (Trickett, *supra,* at pp. 85-86.)

The situation would conceivably be tolerable if "moral certainty" had a common meaning in everyday speech, but that hope quickly proves to be vain. The very same court that bequeathed us the problem subsequently explained that "The phrase 'moral certainty' has been introduced into our jurisprudence from the publicists[8] and metaphysicians" (*Commonwealth v. Costley* (1875) 118 Mass. 1, 23 (per Gray, C. J.)). Neither of these arcane sources, of course, is familiar to the average venireman, and without their specialized knowledge he will inevitably go astray. In ordinary usage, as McBaine notes, "The word moral suggests a distinction between good and evil in relation to the actions or character of responsible beings." (McBaine, *supra*, at p. 258, fn. 35.) But as we saw in connection with the phrase "moral evidence," it makes no sense whatever to speak of a "pure" or "righteous" or "upright" certainty. Its meaning, if any, must lie elsewhere.[9]

How the phrase is understood seems to depend in large part on whether the listener emphasizes its "moral" element or its reference to "certainty." If the former, the phrase is deemed to be merely a synonym for proof that is beyond a reasonable doubt but short of absolute certainty. Thus the court in *Costley* defined "moral certainty" as "a very high degree of probability" (118 Mass. at p. 23), and flatly asserted that proof beyond a reasonable doubt" is proof 'to a moral certainty,' as distinguished from an absolute certainty. As applied to a judicial trial for crime, the two phrases are synonymous and equivalent; each has been used by eminent judges to explain the other . . . ." (*Id.*, at p. 24.) This appears to be the view taken in California, although our decisions are in some disaccord as to whether these terms are synonymous, with one opinion even stating that proof to a "moral certainty" may be *less* than proof beyond a reasonable doubt. (*Drown* v. *New Amsterdam Casualty Co.* (1917) 175 Cal. 21, 24 [165 P. 5].)

Yet the opposite view, stressing the element of "certainty," may actually be one that jurors are more likely to hold. McBaine observes that moral certainty "sometimes means a degree of probability so great as *not* to admit of reasonable doubt. . . . To use the phrase moral certainty may convey the idea to the jury that absolute certainty is required," which, he points out, is not the degree of belief necessary to convict. (Italics added; McBaine, *supra*, at pp. 258-259, fn. 35.) Voicing this same concern, the

[8]At the time, a "publicist" was a scholar of international law.

[9]One court gave up early, and ruled simply that "The word 'moral,' in that connection, meaning nothing more than 'intellectual' or 'mental,' is therefore the same as 'reasonable.' " (*People* v. *Dewey* (1885) 2 Idaho 83 [6 P. 103, 106].)

Supreme Court of Virginia held that although proof beyond a reasonable doubt and to a moral certainty are synonymous, "when both expressions are used in the same instruction, the jury, who are not expected to know the technical meaning of such phrases, would naturally believe that something *more* than proof beyond a reasonable doubt was necessary before they could convict." (Italics added.) (*Heller* v. *Commonwealth* (1923) 137 Va. 782 [119 S.E. 69, 72]; accord, *State* v. *Koski,* (1925) 100 W.Va. 98 [130 S.E. 100, 101].) But that inference, however natural, immediately collides with the opening portion of CALJIC No. 2.90, which tells the juror that proof beyond a reasonable doubt *is* sufficient.

Nor, finally, can a juror escape this dilemma by taking the phrase literally, rather than stressing either of its elements. As a federal court soundly observed, "moral certainty" is a phrase that "involves a contradiction approaching absurdity; for 'certainty' imports a truth of fact and proven beyond any doubt or question, while 'moral' imports the like proven to only probability. That is to say, taken literally and not in judicial forced construction to sanction its use, the term imports a truth of fact *probably* proven *beyond any doubt* or question." (Italics added.) (*United States* v. *Thompson* (W.D.Wash. 1926) 11 F.2d 875, 876.) Again the result can only be confusion.

For the foregoing reasons, many distinguished courts have criticized the phrase "moral certainty" and urged that it not be used when instructing the jury on reasonable doubt. Thus the United States Supreme Court long ago warned, after quoting Chief Justice Shaw's definition, "The difficulty with this instruction is, that the words 'to a reasonable and moral certainty' add nothing to the words 'beyond a reasonable doubt;' one may require explanation as much as the other." (*Hopt* v. *Utah* (1887) 120 U.S. 430, 440 [30 L.Ed. 708, 711, 7 S.Ct. 614].) More recently, the Second Circuit criticized the use by federal district courts of "the ambiguous term 'moral certainty' in its many variations." (*United States* v. *Hart* (2d Cir. 1969) 407 F.2d 1087, 1091.) Shortly thereafter the same court said that "While we do not see why the phrase 'moral certainty' should continue to be employed at all," its use there was not "plain error," i.e., error grave enough to require reversal even though the defendant failed to object at trial. (*United States* v. *Acarino* (2d Cir. 1969) 408 F.2d 512, 517; see also *United States* v. *Scarbrough* (9th Cir. 1972) 470 F.2d 166, 169.)

Far more forceful was the federal court quoted above. (*United States* v. *Thompson* (W.D.Wash. 1926) *supra,* 11 F.2d at p. 876.) Writing only one

year before our Legislature incorporated the *Webster* definition of reasonable doubt into section 1096, the court remarked: "Chief Justice Shaw stated that the term 'reasonable doubt' is 'often used, probably pretty well understood, but not easily defined,' and, thereupon essaying the task, he delivered himself of the musical phrase that reasonable doubt is absence of 'an abiding conviction to a moral certainty of the truth of the charge.' At the same time he admitted it was of difficult comprehension, though he addressed it to jurors drawn from within the shades of learned Harvard. Of it, it is not too much to say it is rather a sing-song incantation, which conveys little more meaning than would its original Gothic and Latin to the average juror; and obviously it was in Bishop's mind (Crim. Proc. § 1094) when he wrote that definition of reasonable doubt 'will darken more minds of the classes from which our jurors are mainly drawn, than it will enlighten.' That therein Bishop well might have included judges, appellate as well as trial, is evidenced by innumerable cases in the books."[10]

The appellate courts of a number of our sister states have been equally critical. Thus in *Commonwealth* v. *Holt* (1944) 350 Pa. 373 [39 A.2d 372, 379], the trial court refused to instruct on proof of guilt to a "moral certainty"; the Pennsylvania Supreme Court held there was no error, stating that "The defendant was not prejudiced by the judge's hesitation to require the jury to consider the metaphysical concept of 'moral certainty.'" (Fn. omitted.) A decade later the same court categorically condemned all instructions embodying that "metaphysical concept": "We are of the opinion that the use of the words 'moral certainty' serves to confuse and befog the jury instead of enlightening and aiding them in determining whether the Commonwealth has convinced them of the guilt of the defendant beyond a reasonable doubt, and that in the future it would be wiser if the charge did not contain any reference to 'moral certainty.'" (Fn. omitted.) (*Commonwealth* v. *Kloiber* (1954) 378 Pa. 412 [106 A.2d 820, 828].) The Connecticut Supreme Court similarly concluded, "Nor is the phrase 'moral certainty' one the use of which is likely to be of benefit to a jury. It is an artificial form of words, having no precise and definite meaning." (*State* v. *Gallivan* (1902) 75 Conn. 326 [53 A. 731, 733].)

In *Boyer* v. *United States* (D.C.Mun.App. 1944) 40 A.2d 247, 250, the trial court struck the phrase "to a moral certainty" and instructed only on

---

[10]The court's reference to "Bishop" is, of course, to a leading treatise of the period (1 Bishop's New Criminal Procedure (1895) § 1094, p. 683), in which the author concludes that "we have not one [affirmative definition of reasonable doubt] which can safely be pronounced both helpful and accurate."

reasonable doubt. The appellate court found no error, reasoning that "The addition of the words 'to a moral certainty' would not, we think, add anything to the instruction. The words themselves would require explanation by the court. . . ." (Fn. omitted.) Conversely, in *Norman* v. *State* (1912) 10 Ga. 802 [74 S.E. 428, 429], the trial court failed to instruct in terms of reasonable doubt, but advised the jury that the defendant's guilt must be established "to the exclusion of any other reasonable hypothesis"[11] and "to a moral and reasonable certainty." Holding the instruction to be reversible error, the court reasoned: "It may be conceded that these expressions are logically and legally the equivalents of 'beyond a reasonable doubt,' and, if the jury was composed of erudite men, familiar with legal or logical terminology, either might be used to express the degree of mental conviction necessary to convict of crime. But we venture to say that the expression 'reasonable hypothesis' would convey no very definite idea to the mind of those ordinarily selected as jurors, and the words 'moral and reasonable certainty' would be little more illuminating. The words 'beyond a reasonable doubt' are easily understood by every man."

Indeed, it is not only jurors who may find the phrase "moral certainty" unintelligible. In *State* v. *Sykes* (1913) 248 Mo. 708 [154 S.W. 1130, 1132], the trial court refused to give an instruction stating in part that " 'The defendant's guilt must be established beyond a reasonable doubt. Proof beyond a reasonable doubt is such as will produce an abiding conviction in the mind to a moral certainty that the fact exists that is claimed to exist. . . .' " The Missouri Supreme Court held the instruction was properly refused, declaring that "We can clearly understand the first sentence in it, viz.: 'The defendant's guilt must be established beyond a reasonable doubt.' The remainder of the instruction is unintelligible to us."

The criticisms of the courts have been echoed by the legal scholars. In another article quoted with evident approval by Wigmore (Wigmore, *supra*, at p. 321), the author attributes to Starkie on Evidence (1824) the introduction of the phrase "moral certainty," and asks rhetorically: "Now, why perplex the administration of justice by interjecting this new element of uncertainty? Why not leave the courts and juries alone to grapple as best they may with the difficulty of determining, without any test, what constitutes a reasonable doubt, without adding to that difficulty the certainly equal difficulty of determining what constitutes a moral

---

[11]This test also appears to have originated in Massachusetts. (See *Commonwealth* v. *Costley* (1873) *supra*, 118 Mass. 1, 23.)

certainty? What possible end can such a heaping up of indefinable terms serve, but to confuse and baffle rather than enlighten and aid the average juror?" (May, *Some Rules of Evidence: Reasonable Doubt in Civil and Criminal Cases* (1876) 10 Am.L.Rev. 642, 658.)[12] Admonishing that "No man can measure with a rule he does not understand; neither can juries determine by rules obscure in themselves, and made yet more obscure by attempted definition," May deprecates Chief Justice Shaw's "unsuccessful, not to say unfortunate, attempt to define what constitutes a 'reasonable doubt.' " (Fn. omitted; *id.,* at p. 663.)

In similar terms, Morgan denounces continued use of "the highsounding but meaningless phraseology of the *Webster* case." (Fn. omitted.) (Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof* (1933) 47 Harv.L.Rev. 59, 63 (hereinafter Morgan).) And McBaine strikes to the heart of the matter by urging that "the rhetorical and flowery language commonly employed in instructions upon reasonable doubt should be eliminated. Words with doubtful or obscure meanings should be avoided. Plain words and phrases should be used which define the degree of belief which must exist; words and phrases which do not suggest a test of a nebulous or a mysterious nature. The phrases 'moral certainty' and 'abiding conviction' borrowed from Chief Justice Shaw's charge to the jury in the famous *Webster* case should be replaced by simpler language. . . ." (Fn. omitted; McBaine, *supra,* at p. 258.)[13]

### III

The problem is plain, the solution less so. I do not underestimate the difficulty of redrafting the definition of reasonable doubt in section 1096 to make it intelligible to modern juries. Because the syntax of Chief Justice Shaw is almost as antiquated as his vocabulary, little would be gained by merely substituting contemporary synonyms for the key words of his original formula. Yet a complete reworking of the definition would present significant risks. It might well introduce new and unsuspected

[12]The writer is Chief Justice John W. May of Boston, described by McBaine (*supra,* at p. 256) as "author of the well known treatise on criminal law." (See May's Criminal Law (3d ed. 1905).)

[13]Ironically, not even Massachusetts follows the language of its former Chief Justice as slavishly as we do: the Massachusetts Supreme Court recently recognized that the instructions it approves on this topic are based on *Webster,* but only "as modified and unquestionably improved by some variations from the exact language of the *Webster* case." (*Commonwealth* v. *Ferreira* (1977) – Mass. – [364 N.E.2d 1264, 1273], fn. 12.) Yet like an ancient insect trapped in amber, the original language of *Webster* is still found intact in California law.

ambiguities that would come to light only after our trial courts had relied on the revised version, requiring in due course the reversal of numerous convictions; and if drafted in sufficient detail to minimize that danger it would certainly be far more wordy than it is today,[14] giving rise to the prolixity in instructions that we have often censured. (See, e.g., *Ritchey* v. *Watson* (1928) 204 Cal. 387, 390-391 [268 P. 345]; *People* v. *Bickerstaff* (1920) 46 Cal.App. 764, 775 [190 P. 656] (opn. on den. of hg. by Supreme Ct.).)

Happily there is another alternative, a solution adopted by fully half of the states of the Union and long advocated by leading scholars. These authorities recognize that all attempts to define the phrase "beyond a reasonable doubt" are at once futile and unnecessary. They are futile because, as we have seen, the definition is more complicated than the phrase itself and results in confusing rather than enlightening the jury; and they are unnecessary because "beyond a reasonable doubt" is not a technical legal term requiring learned explanation, but a phrase of common meaning and usage that is known to and understood by the average juror. From these premises both courts and Legislatures have concluded that in criminal cases the jury should simply be instructed on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, with no effort being made to define the latter phrase.

Some examples of this reasoning may be helpful. The United States Supreme Court has observed on several occasions that "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." (*Miles* v. *United States* (1880) 103 U.S. 304, 312 [26 L.Ed. 481, 484]; accord, *Dunbar* v. *United States* (1895) 156 U.S. 185, 199 [39 L.Ed. 390, 395, 15 S.Ct. 325]; *Holland* v. *United States* (1954) 348 U.S. 121, 140 [99 L.Ed. 150, 166, 75 S.Ct. 127].) Indeed, "The rule may be, and often is, rendered obscure by attempts at definition, which serve to create doubts instead of removing them." (*Hopt* v. *Utah* (1887) *supra,* 120 U.S. 430, 440-441 [30 L.Ed. 708, 712].) And the Seventh Circuit recently amplified the point: "We are here dealing with ordinary English words of common acceptance. 'I doubt that' is a common expression. It is ordinary practice in negligence cases to instruct on the standard of care of a *reasonable* man. . . . The phrase is not esoteric, such as *res ipsa loquitur,* nor is it confusingly similar to other more common

---

[14]For example, although as just noted McBaine urges that Chief Justice Shaw's formula be replaced by "simpler language," his own proposal for such a statute and its implementing instructions runs for almost five pages. (McBaine, *supra,* at pp. 264-268.)

words . . . [as is] 'proximate' or some of those employed in patent law. [¶] Because of the very commonness of the words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion." (First italics added.) (*United States* v. *Lawson* (7th Cir. 1974) 507 F.2d 433, 442.)

Many courts stress the dangers of attempting to define the phrase "beyond a reasonable doubt." "It is said that scholastic attempts to explain the meaning of such words, which are more easily understood than explained, are liable to lead such men as commonly make up our juries to think that the ordinary processes of reasoning, by which they are accustomed to come to conclusions in the ordinary affairs of life, are not suitable to the jury room in a criminal case, but that some other process of reasoning is to be adopted which they are to gather from the language of the trial judge, and that they are thereby really weakened in their ability to come to a just conclusion; that it would be better to leave them to exercise their own intelligence in regard to language so plain that it is not easy to make it plainer by explanation." (*Buel* v. *State* (1899) 104 Wis. 132 [80 N.W. 78, 85].)

Perhaps the danger cited most often is confusion of the jury. "It has frequently been stated by this court and other authorities that any definition on the part of the courts of reasonable doubt only tends to confuse the jury and renders uncertain an expression which, standing alone, is ordinarily well understood as certain and intelligible." (*People* v. *Ahrling* (1917) 279 Ill. 70 [116 N.E. 764, 769], accord, *People* v. *Gormach* (1922) 302 Ill. 332 [134 N.E. 756, 760].) "It is difficult to explain simple terms like 'reasonable doubt' so as to make them plainer. [Citation.] Every attempt to explain them renders an explanation of the explanation necessary." (*State* v. *Robinson* (1893) 117 Mo. 649 [23 S.W. 1066, 1069].) "Whenever a court undertakes to define a 'reasonable doubt,' it opens the way to a vast amount of speculative reasoning, without any very practical application. . . . The writer very much doubts whether any confusion has ever existed in the minds [*sic*] of a juryman in regard to the meaning of the term, except where that confusion has arisen from such attempts to define the term." (*Barney* v. *State* (1896) 49 Neb. 515 [68 N.W. 636, 639].)

Several courts emphasize the obscurity of the language traditionally used in the attempts to explain reasonable doubt. "[W]e do not think that juries can derive any help from attempts by numerous and complicated requests to explain what would be very much plainer without them. If a jury cannot understand their duty when told they must not convict when

they have a reasonable doubt of the prisoner's guilt, or of any fact essential to prove it, they can very seldom get any help from such subtleties as require a trained mind to distinguish. Jurors are presumed to have common sense, and to understand common English. But they are not presumed to have professional, or any high degree of technical or linguistic training." (*Hamilton* v. *People* (1874) 29 Mich. (7 Post) 173, 194; accord, *People* v. *Cox* (1888) 70 Mich. 247 [38 N.W. 235, 240-241].) "The terms of the expression 'reasonable doubt' import the most exact idea of its meaning, and are incapable of simplification, and there is no equivalent in phrase more easily understood. All such endeavor is futile and foredoomed; the usual result being a maze of casuistry, tending to confuse rather than to enlighten. . . ." (*Lipscomb* v. *State* (1898) 75 Miss. 559 [23 So. 210, 212].)

By contrast, it is often asserted that the phrase "beyond a reasonable doubt" is self-explanatory. "The term 'reasonable doubt' has no other or different meaning in law than it has when used in any of the ordinary transactions or affairs of life. It is doubtful whether any better definition of the term can be found than the words themselves." (*People* v. *Barkas* (1912) 255 Ill. 516 [99 N.E. 698, 702-703]; accord, *People* v. *Flynn* (1941) 378 Ill. 351 [38 N.E.2d 49, 52], and cases cited.) "It is to be presumed that the jury understood what the words 'reasonable doubt' meant. The idea intended to be expressed by these words can scarcely be expressed so truly or so clearly by any other words in the English language. . . ." (*State* v. *Davis* (1892) 48 Kan. 1 [28 P. 1092, 1096]; accord, *State* v. *Larkin* (1972) 209 Kan. 660 [498 P.2d 37, 39].) "It is doubtful if the meaning of the words 'reasonable doubt' can be made any clearer or plainer to intelligent men by any definition thereof that can be given, and instructions attempting to define a reasonable doubt are generally condemned by the textwriters on evidence. . . . Any attempted definition of terms of such common use and self-evident meaning as 'reasonable doubt' is more apt, we think, to confuse rather than enlighten a jury. . . ." (*State* v. *Worley* (1918) 82 W.Va. 350 [96 S.E. 56, 58].)

"The reason why courts are generally disinclined to enter into an explanation of the term [reasonable doubt] is that, while the expression is itself well calculated to convey to the jurors a correct idea of what is expected of them, any effort at further elucidation tends to misleading refinements. To attempt to give a specific meaning to the word 'reasonable' would be 'trying to count what is not number, and to measure what is not space.' Steph.Cr.Law, p. 62." (*State* v. *Smith* (1894) 65 Conn. 283 [31 A. 206, 207].) "The term 'reasonable doubt' is almost incapable of any

definition which will add much to what the words themselves imply. In fact it is easier to state what it is not than what it is; and it may be doubted whether any attempt to define it will not be more likely to confuse than to enlighten a jury." (*State* v. *Sauer* (1888) 38 Minn. 438 [38 N.W. 355, 356].)[15] In short, "it would seem that the meaning of the phrase 'reasonable doubt' is obvious; and for the courts to attempt to explain it to the jury is to 'gild refined gold,' or add another ray unto the sunlight." (*Barker* v. *State* (1907) 1 Ga.App. 532 [57 S.E. 989, 990-991]; accord, *Nelms* v. *State* (1905) 123 Ga. 575 [51 S.E. 588, 589]; see also *Burt* v. *State* (1894) 72 Miss. 408 [16 So. 342, 343].)

Thus in *Claussen* v. *State* (Wyo. 1913) *supra,* 133 P. 1055, 1056, the trial court gave no instruction defining reasonable doubt, and refused the defendant's request to instruct in terms of the definition of Chief Justice Shaw in *Webster.* The Wyoming Supreme Court held it was not error to refuse this instruction: "In our judgment there is no definition of 'reasonable doubt' which would convey to a juror's mind any clearer idea than the term itself. . . . Every juror knows, or ought to know, what a doubt is and the meaning of the word 'reasonable' as applied to such doubt. Is it any clearer in meaning to say to a juror that, if he be convinced from the evidence to a moral certainty of defendant's guilt, then he has no reasonable doubt? What does moral certainty mean more than reasonable certainty or beyond a reasonable doubt? . . . We think the definition requested failed to define 'reasonable doubt,' or make its meaning any clearer to the jury than the phrase itself, and for that reason the court did not err in refusing to give it." (Accord, *State* v. *Eldredge* (1933) 45 Wyo. 488 [21 P.2d 545, 547-548]; *State* v. *Velsir* (1945) 61 Wyo. 476 [159 P.2d 371, 377-378].)[16]

Once again the legal scholars are in general accord. Bishop stated the point succinctly: "There are no words plainer than 'reasonable doubt,'

[15]The writer is Mitchell, J., called by Wigmore "one of the great judicial minds of his generation." (Wigmore, *supra,* at p. 323, fn. 6.)

[16]The appellate courts of more than a dozen additional states have expressed similar views. (See, e.g., *McAlpine* v. *State* (1872) 47 Ala. 78, 82; *State* v. *Freeman* (1963) 85 Idaho 339 [379 P.2d 632, 635]; *Mickey* v. *Commonwealth* (1873) 72 Ky. 593, 598; *State* v. *De Lea* (1908) 36 Mont. 531 [93 P. 814, 817]; *Territory* v. *Chavez* (1892) 6 N.M. 455 [30 P. 903, 905]; *State* v. *Wilcox* (1903) 132 N.C. 1120 [44 S.E. 625, 631]; *State* v. *Liberman* (1930) 59 N.D. 252 [229 N.W. 363, 364]; *Wilson* v. *State* (Okla.Crim. 1965) 403 P.2d 262, 264; *State* v. *Ching Ling* (1888) 16 Ore. 419 [18 P. 844, 849]; *State* v. *Andrews* (1957) 86 R.I. 341 [134 A.2d 425, 430]; *Lenert* v. *State* (Tex.Crim. 1901) 63 S.W. 563, 565; *State* v. *Blay* (1904) 77 Vt. 56 [58 A. 794, 795]; *McCoy* v. *Commonwealth* (1922) 133 Va. 731 [112 S.E. 704, 705]; see also *People* v. *McDonnell* (1917) *supra,* 32 Cal.App. 694, 702-703.)

and none so exact to the idea meant." (1 Bishop's New Criminal Procedure (1895) § 1094, p. 682.) In a passage often quoted with approval by the courts, another leading treatise-writer of the period asserted: "All the definitions [of reasonable doubt] are little more than metaphysical paraphrases of an expression invented by the common-law judges, for the very reason that it was capable of being understood and applied by plain men in the jury box. The danger of attempting these definitions and explanations is, that they are liable to impress jurors with the idea that their verdict is not to be the result of the natural impression which the evidence has made upon their minds, but of some artificial rule which the law has created for them to apply in reaching it." (2 Thompson on Trials (2d ed. 1912) § 2463, p. 1733.) The author strongly reproached the courts that have "felt called upon, in instructing juries in criminal cases, to explain this expression, although it is one of the most exact expressions known to the law, and to define this definition, although the original words convey a more exact idea to the minds of average men than can be derived from any attempt to define them. In so doing, they have attempted to lead juries into mazes of subtlety and casuistry, in which they were lost themselves, and into which the minds of plain men were incapable of following them." (*Id.,* at p. 1734.)

In the same vein, Wigmore inveighs against the "various efforts [that] have been made to define more in detail this elusive and undefinable state of mind," i.e., beyond a reasonable doubt; and he warns, "when anything more than a simple caution and a brief definition is given, the matter tends to become one of mere words, and the actual effect upon the jury, instead of being enlightenment, is likely to be rather confusion, or, at the least, a continued incomprehension. . . . The effort to perpetuate and develop these elaborate unserviceable definitions is a useless one, and serves to-day chiefly to aid the purposes of the tactician. It should be abandoned . . . ." (Fn. omitted; Wigmore, *supra,* at pp. 317, 318-320.) The draftsmen of the Model Penal Code agree: although that code requires proof beyond a reasonable doubt of each element of the offense charged, "No effort is made to define 'reasonable doubt,' in the view that definition can add nothing helpful to the phrase." (Model Pen. Code (Tent. Draft No. 4, 1955) com. to § 1.13, p. 109.)[17]

A recent author reaches the same result for a different but equally compelling reason. (Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity* (1979) 92 Harv.L.Rev. 1187.) The author

---

[17]The draftsmen then cite California Penal Code section 1096 as an example of an "attempted" definition of this sort.

observes that a central purpose of the standard of proof beyond a reasonable doubt is to enhance the moral force of the criminal law by promoting public confidence in the correctness of jury verdicts. (*Id.,* at p. 1195; see also *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) He explains that "The concept of reasonable doubt speaks to the psychological need to forestall continued worry about the validity of guilty verdicts. As long as the concept is left ambiguous, members of the observing public may assume that they share with jury members common notions of the kinds and degree of doubt that are unacceptable. . . . To the extent that the assumption exists of a shared concept of the necessary standard of proof, general acceptance of the judgments of guilt rendered by jurors under that standard will be facilitated.

"Viewed in this light, it becomes clear that precise attempts to define the concept of reasonable doubt undercut its function. Each of us, in effect, has his own subjective sense of when a chance of innocence can be disregarded as de minimis, but our respective senses are surely different. If guilty verdicts, once rendered, continued to be questioned because of disagreement about the precise de minimis notion to apply, acceptability would be undermined, and the process of adjudication, to that extent, would have failed to accomplish one of its major objectives. Reasonable doubt defies exact definition precisely because it is a concept meant to encompass many different, individual views of how probable guilt must be (or how unlikely innocence must be) to warrant conviction." (Fn. omitted; 92 Harv.L.Rev. at pp. 1196-1197.)

Most commentators also agree that the best solution is the simplest. Morgan explains that "Where proof beyond reasonable doubt is required, the charge should not be difficult to frame. . . . It is coming to be recognized that all attempts to define reasonable doubt by paraphrase or circumlocution tend only to obfuscate rather than clarify the concept. . . . Where the judge specifies the particular facts to be proved by the state and then in plain language tells the jury that the state does not satisfy its burden of proving them unless the evidence convinces the jury beyond reasonable doubt of the existence of each of these facts, there is no danger that the average juror will fail to understand. If he is intelligent enough to sit upon a jury, he is intelligent enough to comprehend so simple an instruction." (Fn. omitted; Morgan, *supra,* at pp. 63-64.)

Morgan concludes (at p. 64) that "Where a court conceives itself to be helplessly bound by precedent to insist upon the repetition of incompre-

hensible formulae, the only relief lies in legislation." (Fn. omitted.) Ironically, in California our trial courts are "helplessly bound" to repeat such "incomprehensible formulae" by the very legislation supposed to provide relief, the 1927 amendment to section 1096—a statute that Morgan disparages as a safe but "not very acceptable" method of protecting trial courts from reversal. (*Id.*, at p. 64, fn. 13.) McBaine joins in this criticism, disapproving section 1096 because it incorporates "the inept expressions 'moral evidence,' 'abiding conviction' and 'moral certainty.' " (McBaine, *supra*, at p. 264, fn. 38.) By contrast, he cites statutes from a number of other states that simply declare the presumption of innocence and requirement of proof beyond a reasonable doubt, without making any attempt to define the latter phrase. (*Ibid.*)

That is the solution I urge our Legislature to adopt. It is fully consistent with both present and former California law. Evidence Code section 502 directs the trial court to instruct the jury "as to which party bears the burden of proof on each issue" and as to whether that burden requires the party to "establish the existence or nonexistence of a fact . . . by proof beyond a reasonable doubt." I agree the jury must be so instructed, but I see no need for the trial court to undertake a definition of "proof beyond a reasonable doubt." For the reasons stated above, I believe that phrase is commonly understood by all persons of ordinary intelligence and experience. It is settled in California that "Since jurors are presumed to possess ordinary intelligence and to be capable of understanding the meaning and use of words in their common and ordinary application, the trial judge is not required to define simple words and phrases employed in an instruction." (*Pobor* v. *Western Pac. R.R. Co.* (1961) 55 Cal.2d 314, 323 [11 Cal.Rptr. 106, 359 P.2d 474].) This rule has been applied to a wide variety of terms used in instructing the jury in criminal trials;[18] "proof beyond a reasonable doubt," I submit, is no less familiar to the average juror today. Of virtually all such terms it can be said that "a jury which did not understand them would not understand an explanation of them." (*People* v. *Halbert* (1926) *supra*, 78 Cal.App. 598, 612.) Certainly this is

---

[18]See, e.g., *People* v. *Chavez* (1951) 37 Cal.2d 656, 668 [234 P.2d 632] ("perpetrate"); *People* v. *Wong Hing* (1917) 176 Cal. 699, 706 [169 P. 357] ("aiding and abetting"); *People* v. *Scott* (1959) 176 Cal.App.2d 458, 503 [1 Cal.Rptr. 600] ("criminal agency"); *People* v. *Shannon* (1956) 147 Cal.App.2d 300, 305 [305 P.2d 101] ("impeach"); *People* v. *Taylor* (1953) 116 Cal.App.2d 802, 806-807 [254 P.2d 179] ("fraud," "artifice," "trick," and "device"); *People* v. *Bill* (1934) 140 Cal.App. 389, 396-397 [35 P.2d 645] ("possession" and "habit forming narcotic"); *People* v. *Roth* (1934) 137 Cal.App. 592, 606 [31 P.2d 813] ("solvent" and "insolvent"); *People* v. *Halbert* (1926) 78 Cal.App. 598, 612 [248 P. 969] ("wilful," "wanton," and "wantonness"); *People* v. *Anderson* (1922) 58 Cal.App. 267, 269-271 [208 P. 324] ("due caution and circumspection").

true of the "explanation" of reasonable doubt currently embodied in section 1096 and in the many other definitions proposed over the years.[19]

In deleting the definition of reasonable doubt from section 1096 the Legislature would simply be returning our law to the state it was in from 1850 to 1927.[20] The problem that arose during the same period and resulted in the 1927 amendment—excessive reversals on the ground of erroneous definitions of reasonable doubt—could easily be avoided by prohibiting the giving of any instruction defining the phrase; this solution is followed by a number of the courts cited above, and could be achieved by a minor modification of section 1096a.[21]

Unless the Legislature takes action in the matter, juries in all California criminal trials will continue to be mystified at best and misled at worst by hearing the concept of reasonable doubt defined in the archaic idiom of CALJIC No. 2.90. "But this, now hallowed, language produces the same sheep like acceptance as the 'Emperor's New Clothes.' Judges awesomely intone the ponderous gibberish, as lawyers hypnotized into believing they understand the fatuity listen respectfully, while jurors, noticing His Honor's serious mien and the lawyers' sage expression, mimic the exampled air of grave comprehension. Thus, the linguistic parade begun in 1850 continues through today without so much as a smile from the marchers." (Fn. omitted; Sinetar, *supra,* at pp. 551-552.)

Whether parade or charade, it is time the pretense was ended and plain speaking restored to the courtroom. Respect for the conscientious men

[19] I recognize that in *People* v. *Vann* (1974) *supra,* 12 Cal.3d 220, 227, this court stated somewhat obliquely that a defendant is entitled to an instruction on the requirement of proof beyond a reasonable doubt "buttressed by additional instructions on the meaning of that phrase" (fn. omitted). The quoted words were plainly dicta, however, unsupported by either analysis or authority. I cannot believe the court would reiterate the statement after mature consideration of the body of judicial and scholarly opinion set forth herein.

[20] The 1927 amendment, however, added one clause to the first sentence of section 1096 that should be retained, because it correctly instructs the jury that the only effect of the presumption of innocence is to put the burden of proof on the People. (See Evid. Code, § 600, subd. (a) ["A presumption is not evidence."].) Slightly rewritten for purposes of clarity, section 1096 could therefore be made to provide as follows: "A defendant in a criminal prosecution is presumed to be innocent until the contrary is proved. The only effect of this presumption is to place on the state the burden of proving the defendant guilty beyond a reasonable doubt. If there is a reasonable doubt whether guilt has been proved, the defendant is entitled to an acquittal."

[21] For example, section 1096a could simply be put in mandatory rather than permissive form: i.e., "In charging a jury, the court *shall* read to the jury section 1096 of this code, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt *shall* be given." (Proposed amendments italicized.)

and women who serve on our juries to the best of their ability demands no less.

Tobriner, J., concurred.

**NEWMAN, J.**—I dissent because I do not believe that traditional boundaries of the right to oral argument are the same as the boundaries that the California Constitution prescribes.

From part II of the 1979 Annual Report of the Judicial Council we learn that "total filings" in the Courts of Appeal were 6,411 in 1967-1968, 13,018 in 1977-1978. In this court the parallel totals were 2,959 and 3,881. (See pp. 47 and 43.)

Do not those and related statistics suggest that in this state the work of appellate judges may be suffering because of a serious overload? Many improvements will be essential, I think. It would be unfortunate if needed experiments and reforms were blocked by archaic assumptions as to how, in fact, oral argument most efficiently helps promote justice.

Appellant's petition for a rehearing was denied October 18, 1979. Clark, J., and Newman, J., were of the opinion that the petition should be granted.